Wynehamer, plaintiff in error, *against* The People, defendants in error.

The People, on the complaint of Mathews, *against* Toynbee.

The provisions of the act to prevent intemperance ( *Laws of* 1855, *p.* 340 ), substantially destroy the property in intoxicating liquors owned and possessed by persons within the state, when the act took effect.

In its application to such liquors so owned and possessed, the act violates the provision of the state constitution which declares that no person shall be deprived of life, liberty or property, without due process of law.

It seems, that had the act by its terms been applicable only to liquors imported or manufactured after it took effect, it would not have been in conflict with the constitutional provision above mentioned.

But as no discrimination is made by its provisions between liquor owned when it took effect and that which might afterwards be manufactured or imported, and they are made operative on both, the act is unconstitutional and void.

The provisions of the act requiring a party charged with a criminal offence under the act, to be tried by a court of special sessions, deprive him of the right to a trial by jury as guaranteed by the constitution, and are void.

Wynehamer *v.* People, 20 Barb. 567, affirmed ; People *v.* Toynbee, Ibid. 168, reversed.

Wynehamer, the defendant in the court below in the case first above entitled, was, in July, 1855, indicted at a court of general sessions, held in and for the county of Erie, for selling intoxicating liquors, contrary to the provisions of the statute entitled " An act for the prevention of intemperance, pauperism and crime." The indictment contained several counts, each of which charged in substance that the defendant, on a day subsequent to the 4th of July, 1855, at the city of Buffalo, wilfully and unlawfully and contrary to the form of the statute, sold to persons unauthorized by law to sell intoxicating liquor to the jury unknown, intoxicating liquor, to wit, a gill each of rum, brandy, gin, wine, whiskey and strong beer, without having filed in the office of the clerk of the county of Erie any undertaking approved by the county judge of that county, according to the provisions of the 2d section of the act. It

was further alleged in each count of the indictment that the liquor so sold was not alcohol manufactured by the defendant, or pure wine manufactured by him from grapes grown by himself; and that the sale of the liquor was not authorized, nor was any right to sell the same given by any law or treaty of the United States. The defendant pleaded not guilty; and the issues were tried in the court of general sessions by a common law jury duly empanneled. On the trial the counsel for the people gave evidence tending to prove that after the 4th day of July, 1855, and before the finding of the bill of indictment, the defendant on several occasions had sold and delivered to different persons at his bar, in Buffalo, brandy, in quantities less than a pint, which was drank on his premises. When the people rested, the counsel for the defendant requested the court to discharge the defendant, or to direct the jury to render a verdict of not guilty, on the following grounds, viz: 1. That it was not shown that any offence had been committed by the defendant; 2. That it did not appear but that the liquor alleged to have been sold was liquor, the right to sell which was given by laws or treaties of the United States, nor but that it was imported by defendant from foreign countries in pursuance of the United States laws; 3. That the 1st and 4th sections of the aforesaid act were respectively in violation of the constitutions of the United States and of this state, and void; 4. That the said act was unauthorized by and in conflict with the laws and treaties of the United States and the constitution of this state, and therefore void; 5. That it was not shown but that the liquor alleged to have been sold by the defendant was authorized to be sold by the act of the legislature above referred to. The court overruled each of the objections, and decided that the case must be submitted to the jury, and the counsel for the defendant excepted. Thereupon the counsel for the defendant offered to prove that the liquor alleged to have been sold was imported into this state from a foreign country,

under and in pursuance of the revenue laws of the United States, and that the legal duties thereon were paid; that the defendant purchased such liquor from the importers in the package in which it was imported; and that it was drawn from such package and sold to the persons and at the times proved by the witnesses for the prosecution. The counsel for the people admitted the truth of the facts so offered to be proved, but objected to their admissibility as evidence, on the ground that they were irrelevant and immaterial. The court so held and excluded the evidence, and the defendant's counsel excepted. The counsel for the defendant also offered to prove that the liquor sold by the defendant was owned and possessed by him previous to and on the 3d of July, 1855; the counsel for the people admitted the fact to be so, but objected to it as evidence on the ground that it was immaterial. The objection was sustained, and the evidence excluded, and the defendant's counsel excepted. At the close of the evidence the counsel for the defendant requested the court to direct the jury to acquit the defendant, on the grounds stated at the close of the evidence for the prosecution. The court declined and the defendant's counsel excepted. The counsel for the defendant also requested the court to charge the jury that the people must prove that the liquor sold by the defendant was intoxicating; the court as to this request charged, that if it was proved that the defendant sold brandy, this was intoxicating liquor within the meaning of the act; and the defendant's counsel again excepted. The jury found the defendant guilty; and the court sentenced him to pay a fine of fifty dollars, and to be committed until the same was paid. The judgment was affirmed by the supreme court sitting in the eighth district. ( *See* 20 *Barbour*, 567.) The defendant sued out a writ of error.

Toynbee, the defendant in the case secondly above entitled, was on the 17th of July, 1855, arrested by Mathews,

Wynehamer *against* The People.

a police officer of the city of Brooklyn, and brought before a police justice of that city, without any precept for his arrest having been issued. When he brought him before the justice, Mathews made a complaint in writing, verified by his oath, which stated that on the day of the arrest the complainant saw the defendant at a place which was specified, in Brooklyn, sell and keep for sale, and have in his possession, with intent to sell, intoxicating liquors, to wit, brandy and champagne; that the complainant saw the defendant engaged in selling liquor, to wit, brandy, in violation of the act for the prevention of intemperance, pauperism and crime; that the offence consisted in selling one glass of brandy and one bottle of champagne; that the complainant had arrested the defendant and brought him before the justice to answer the charge, and to be dealt with according to law; and that at the time and place of the offence, he, the complainant, seized the said brandy and champagne, with the bottles in which they were contained, and had stored them in a convenient place, to be disposed of as provided by the aforesaid act. The defendant asked to be discharged, on the ground that the act was unconstitutional, and on the further ground that the complaint did not set forth facts sufficient to constitute an offence by the defendant. His application was denied. He then objected to being tried by a court of special sessions, and offered to give bail for his appearance at the next court having criminal jurisdiction. The justice overruled the objection, refused to take bail, and required the defendant to plead to the charge. The defendant pleaded not guilty, and thereupon the complainant was sworn and testified that the defendant kept a hotel in Brooklyn, in the basement of which he kept a bar room; that on the 17th of July, he, the witness, saw the defendant sell a glass of brandy and a bottle of champagne, which were intoxicating liquors, and that the defendant kept for sale in his bar room such liquors. He further testified that the champagne was im-

ported liquor; and that he, the witness, on the occasion aforesaid, seized and took into his possession the bottle of brandy from which the defendant sold, and the bottle of champagne which he had sold and was in the act of delivering. The foregoing is the substance of all the evidence. The court found the defendant guilty of selling and having in his possession with intent to sell, intoxicating liquors, as charged in the complaint, adjudged him guilty of a misdemeanor, and sentenced him to pay a fine of $50, and $5.87 costs of the proceedings, and that he be imprisoned until the same were paid, not exceeding fifty-six days. The court further adjudged that the liquor seized be forfeited, and that a warrant for its destruction be issued. On appeal by the defendant, the judgment was reversed by the supreme court at a general term in the second district. (*See* 20 *Barb.*, 168.) The people appealed to this court.

*A. J. Parker*, for the plaintiff in error, in the case first entitled.

*A. Sawin*, for the people.

*J. M. Van Cott*, for the people, in the case secondly entitled.

*John A. Lott*, for the defendant.

The opinion by COMSTOCK, J., and that by T. A. JOHNSON first inserted, and by MITCHELL secondly inserted, were delivered in the case of Wynehamer, first above entitled. The other opinions, except that by DENIO, C. J., which states his conclusions as to both cases, were delivered in the case of Toynbee.

COMSTOCK, J. The defendant, Wynehammer, was indicted and convicted by a common-law jury, in the court of sessions

Wynehamer *against* The People.

of Erie county, for selling liquors in small quantities con-
trary to the "Act for the prevention of intemperance, pauper-
ism and crime," passed April 9, 1855.  The indictment con-
tains no allegations to bring the case within any of the excise
laws of the state, even if those can be regarded as unrepealed,
and the conviction therefore must stand, if it can stand at
all, upon the statute referred to.  It was admitted on the
trial that the defendant was the owner of the liquors in
question before and at the time the law took effect; and
his counsel insisted that he was entitled to an acquittal on
the ground, among others, that the statute was unconstitu-
tional and void.  The proposition was overruled.  The
supreme court in the 8th district affirmed the conviction;
thus determining that the act, in its prohibitory clauses, was
constitutional and valid; and this is the only question I shall
consider.

The constitution of this state has vested "the legislative
power" in the senate and assembly, subject, however, to
some special limitations, which are of very great interest
and importance.  It is declared (*art.* 1, § 1) that "no mem-
ber of this state shall be disfranchised or deprived of any
of the rights or privileges secured to any citizen thereof,
unless by the law of the land or the judgment of his peers."
It is further declared (*art.* 1, § 6) " that no person shall be
deprived of life, liberty or property without due process
of law; nor shall private property be taken for public
use without just compensation."  Without inquiring into
the extent of legislative power, in the absence of special
restraints, I think the case before us can be and should be
determined under these limitations, the construction, force
and application of which will be hereafter considered.

In determining the question, whether the " Act for the
prevention of intemperance, pauperism and crime" was an
exercise of power prohibited to the legislature, an accurate
perception of the subject to which it relates is the first re-
quisite.  It is, then, I believe, universally admitted that when

this law was passed intoxicating liquors, to be used as a beverage, were *property* in the most absolute and unqualified sense of the term; and, as such, as much entitled to the protection of the constitution as lands, houses or chattels of any description. From the earliest ages they have been produced and consumed as a beverage, and have constituted an article of great importance in the commerce of the world. In this country the right of property in them was never, so far as I know, for an instant questioned. In this state, they were bought and sold like other property; they were seized and sold upon legal process, for the payment of debts; they were, like other goods, the subject of actions at law; and when the owner died, their value constituted a fund for the benefit of his creditors, or went to his children and kindred, according to law or the will of the deceased. They entered largely into the foreign and internal commerce of the state, and when subjected to the operation of this statute, many millions in value were invested in them. In short, I do not understand it to be denied that they were property in just as high a sense as any other possession which a citizen can acquire. Judicial authority might be cited, but this does not seem necessary where there is scarcely a controversy.

It may be said, it is true, that intoxicating drinks are a species of property which performs no beneficent part in the political, moral or social economy of the world. It may even be urged, and, I will admit, demonstrated with reasonable certainty, that the abuses to which it is liable are so great, that the people of this state can dispense with its very existence, not only without injury to their aggregate interests, but with absolute benefit. The same can be said, although, perhaps, upon less palpable grounds, of other descriptions of property. Intoxicating beverages are by no means the only article of admitted property and of lawful commerce in this state against which arguments of this sort may be directed. But if such arguments can be allowed

Wynehamer *against* The People.

to subvert the fundamental idea of property, then there is
no private right entirely safe, because there is no limitation
upon the absolute . discretion of the legislature, and the
guarantees of the constitution are a mere waste of words.
The foundation of property is not in philosophic or scien-
tific speculations, nor even in the suggestions of benevolence
or philanthropy. It is a simple and intelligible proposi-
tion, admitting, in the nature of the case, of no qualification,
that that is property which the law of the land recognizes
as such.   It is, in short, an institution of law, and not a
result of speculations in science, in morals or economy.

These observations appear to me quite elementary, yet
they seem to be necessary, in order to exclude the discussion
of extraneous topics.   They lead us directly to the conclu-
sion that all property is alike in the characteristic of invio-
lability.   If the legislature has no power to confiscate and
destroy property in general, it has no such power over any
particular species.   There may be, and there doubtless are,
reasons of great urgency for regulating the trade in intoxi-
cating drinks, as well as in other articles of commerce.   In
establishing such regulations merely, the legislature may
proceed upon such views of policy, of economy or morals.
as may be addressed to its discretion.   The whole field of
discussion is open, when the legislature, keeping within its
acknowledged powers, seeks to regulate and restrain a
traffic, the general lawfulness of which is admitted ; but
when the simple question is, whether it can confiscate and
*destroy* property lawfully acquired by the citizen in intoxi-
cating liquors, then we are to remember that all property
is equally sacred in the view of the constitution, and there-
fore that speculations as to its chemical or scientific quali-
ties, or the mischief engendered by its abuse, have very
little to do with the inquiry.   Property. if protected by
the constitution from such legislation as that we are now
considering, is protected because *it is p operty* innocently

acquired under existing laws, and not upon any theory which even so much as opens the question of its utility. If intoxicating liquors are property, the constitution does not permit a legislative estimate to be made of its usefulness, with a view to its destruction. In a word, that which belongs to the citizen in the sense of property, and as such has to him a commercial value, cannot. be pronounced woithless or pernicious, and so destroyed or deprived of its essential attributes. Sir William Blackstone, who wrote of the laws of England nearly a century ago, said : " So great is the regard of the law for private property, that it will not authorize the least violation of it, no, not even for *the general good of the whole community*. If a new road, for instance, were to be made through the grounds of a private person, it might, perhaps, be extensively beneficial to the public, but the law permits no man, or set of men, to do this without the consent of the owner of the land. In vain may it be urged that the good of the individual ought to yield to that of the community, for it would be dangerous to allow any private man, or even any public tribunal, to be the judge of this common good, and to decide whether it be expedient or no. *Besides, the public good is in nothing more essentially interested than in the protection of every individual's private rights, as modeled by the municipal law.* In this and similar cases, the legislature alone can and frequently does interfere and compel the individual to acquiesce. But how does it interpose and compel ? Not by absolutely stripping the subject of his property, in an arbitrary manner, but by giving him a full indemnity and equivalent for the injury thereby sustained." (1 *Bl. Com.*, 139.)

While this language of the English commentator by no means expresses the full force of the limitation imposed upon the legislature by the people of this state in their written constitution, it contains, nevertheless, a vindication of the sanctity of private property, as against theories of

public good, eminently applicable to our own condition and
times.   In a government like ours, theories of public good
or public necessity may be so plausible, or even so truthful,
as to command popular majorities.   But whether truthful
or plausible merely, and by whatever numbers they are
assented to, there are some absolute private rights beyond
their reach, and among these the constitution places the
right of property.

The views thus far expressed, the substance of which I
think must command a general assent, would seem to nar-
row the field of inquiry.   Do the prohibitions and penalties
of the " Act for the prevention of intemperance, pauperism
and crime" pass the utmost boundaries of mere regulation and
police, and by their own force, assuming them to be valid
and faithfully obeyed and executed, work the essential loss
or destruction of the property at which they are aimed ?
If they do, then, so far as I can see, nothing remains except
to apply the provisions of the fundamental law of the state,
and the act must be declared unconstitutional and void.   In
my judgment, they do plainly work this result.

We must be allowed to know, what is known by all per-
sons of common intelligence, that intoxicating liquors are
produced for sale and consumption as a beverage ; that such
has been their primary and principal use in all ages and
countries ; and that it is this use which has imparted to
them, in this state, more than ninety-nine hundredths of their
commercial value.   It must follow that any scheme of
legislation which, aiming at the destruction of this use,
makes the keeping or sale of them as a beverage, in any
quantity and by any person, a criminal offence—which
declares them a public nuisance—which subjects them to
seizure and physical destruction, and denies a legal remedy
if they are taken by lawless force or robbery, must be deemed,
in every beneficial sense, to deprive the owner of the enjoy
ment of his property.

Wynehamer *against* The People.

Such I understand to be precisely the character of this law.   The only sales which it permits (*vide* § 2) are for mechanical, chemical and medicinal purposes — and of wine for sacramental use.   Even this exception, minute and special as it is, is attended with extraordinary conditions. The person proposing to sell is prohibited, if he pursues any one of some fifteen or twenty lawful avocations; he must be a man of totally abstinent habits; he must give stringent bail, and he must have a good moral character.   Sales may also be made to the authorized venders, but as they can only sell for the particular purposes enumerated, of course sales to them cannot be made in contemplation of any other purpose or use.

With these exceptions, so minute and trivial as scarcely to disturb the general scheme, the act is one of fierce and intolerant proscription.   It is unlawful to sell intoxicating liquors, to keep them for sale, or with intent to sell, and, with an exception of no importance to the question, it is to keep them at all.   (§ 1.)   They are declared a public nuisance (§ 25); and not only by that declaration, but by another express provision, all legal protection is withdrawn from them.   (§ 16.)   If the owner attempts to sell them, he can maintain no action for the price; and if they are taken from him by force or fraud he is remediless.   (§ 16.) In other parts of the act special provisions are contained for seizure, judicial condemnation and destruction.   (§§ 5, 6, 7, 8, 9, 10, 11, 12 and 13.)   But the act by no means waits for the operation of this machinery.   Itself pronounces the sentence of condemnation, and the judicial machinery, such as it is, which it provides are agencies merely to insure the execution of the sentence.   Property is lost before the police are in motion, and, I may add, crime is committed without an act or even an intention.   On the day the law took effect, it was criminal to be in possession of intoxicating liquors, however innocently acquired the day before.   It was criminal to sell them, and under the

law, therefore, no alternative was left to the owner but their immediate destruction. (*Vide* § 4.)

It will be seen, therefore, that aside from the exceptional cases which have been stated, and as a beverage without exception, intoxicating liquors are laid under the ban of absolute and unqualified condemnation. As property, the right to sell them is denied, and their commercial value is thus annihilated. They are, moreover, devoted to physical destruction. Special agencies for destruction are provided; but before these are set in motion the law itself condemns them as property, in a series of provisions entirely free from ambiguity or doubt. It was said, on the argument, that nothstanding the sweeping prohibitions of sale, the owner might still keep them, and even export them, and so effect a total or partial saving of his property. If this were so, I do not see how it would affect the question under consideration. If laws contrived for the destruction of property within the state are unconstitutional and void, they cannot be upheld, even though special leave be given to the owner to remove it from the state, and so place it beyond the reach of those laws. But the suggestion is founded in a misapprehension of the act. From the instant it took effect, intoxicating liquors could not lawfully be kept a single hour with a view to exportation, or kept at all, except for the special purposes of medicine, the sacrament, or for mechanical or chemical uses. It might be smuggled away, but that would not be the fault of the law. It would be quite as logical to say that an act to deprive a man of his liberty or life without a trial, is constitutional, because there is a possibility that he may run away and thus escape.

There are many provisions of this act which were reviewed at length on the argument, and which might now receive a more particular notice. But the summary exposition which has been given is enough for the present purpose. Proceeding upon the admitted hypothesis that the

3 KERN.—25

subject thus denounced and proscribed is property, and like other property essentially inviolable, the inquiry will remain, whether the constitution does not expressly prohibit such legislation ?

It has been urged upon us, that the power of the legislature is restricted, not only by the express provisions of the written constitution, but by limitations implied from the nature and form of our government; that, aside from all special restrictions, the right to enact such laws is not among the delegated powers of the legislature, and that the act in question is void, as against the fundamental principles of liberty, and against common reason and natural rights. High authority, certainly, has been cited to show that laws which, although not specially prohibited by written constitutions, are repugnant to reason, and subvert clearly vested rights, are invalid, and must so be declared by the judiciary. In *Calder and wife* v. *Bull* (3 *Dallas*, 386), Judge Chase said: " I cannot subscribe to the omnipotence of a state legislature, or that it is absolute and without control, although its authority should not be restrained by the constitution or fundamental law of the state. The nature and end of legislative power will limit the exercise of it. This fundamental principle flows from the very nature of our free republican governments, that no man should be compelled to do what the laws do not require, *nor refrain from acts which the laws permit.* There are acts which the federal or state legislature cannot do without exceeding their authority. There are certain vital principles in our free republican governments which will determine and overrule an apparent and flagrant abuse of legislative power; as to authorize manifest injustice by a positive law, or to take away that security for personal liberty or private property, for the protection whereof government was established." " A few instances," he adds, " will suffice to explain what I mean; a law that punishes a citizen for an innocent action, or in other words, for an act which, when done, was in

violation of no existing law — *a law which destroys or impairs the lawful private contracts of citizens* — a law that makes a man a judge in his own case — *a law that takes property from A and gives it to B.* It is against all reason and justice for a people to entrust a legislature with such powers, and therefore it cannot be presumed that they have done it. *The legislature cannot change innocence into guilt, or punish innocence as a crime, or violate the right of antecedent lawful private contract, or the right of private property.*" Chief Justice Marshall said, in *Fletcher* v. *Peck* (6 *Cranch*, 135): "It may be doubted whether the nature of society and of government does not prescribe some limits to the legislative power; and if any be prescribed, where are they to be found, *if the property of an individual, fairly and honestly acquired, may be seized without compensation?*" (*See also Dash* v. *Van Kleeck*, 7 *Johns.*, 477; *Taylor* v. *Porter*, 4 *Hill*, 146 — *per* Bronson, J.; *Goshen* v. *Stonington*, 4 *Conn.*, 225 — *per* Hosmer, J.)

I entertain no doubt that, aside from the special limitations of the constitution, the legislature cannot exercise powers which are in their nature essentially judicial or executive. These are, by the constitution, distributed to other departments of the government. It is only the "legislative power" which is vested in the senate and assembly. But where the constitution is silent, and there is no clear usurpation of the powers distributed to other departments, I think there would be great difficulty and great danger in attempting to define the limits of this power. Chief Justice Marshall said (*Fletcher* v. *Peck*, *supra*): "How far the power of giving the law may involve every other power, in cases where the constitution is silent, never has been, and perhaps never can be, definitely stated." That very eminent judge felt the difficulty; but the danger was less apparent then than it is now, when theories, alleged to be founded in natural reason or inalienable rights, but subversive of the just and necessary powers of government.

attract the belief of considerable classes of men, and when too much reverence for government and law is certainly among the least of the perils to which our institutions are exposed. I am reluctant to enter upon this field of inquiry, satisfied as I am that no rule can be laid down in terms which may not contain the germ of great mischief to society, by giving to private opinion and speculation a license to oppose themselves to the just and legitimate powers of government. Nor is it necessary to push our inquiries in the direction indicated. There is no process of reasoning by which it can be demonstrated that the "Act for the prevention of intemperance, pauperism and crime" is void, upon principles and theories outside of the constitution, which will not also, and by an easier induction, bring it in direct conflict with the constitution itself.

I am brought, therefore, to a more particular consideration of the limitations of power contained in the fundamental law: "No member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers. No person shall be deprived of life, liberty or property, without due process of law; nor shall private property be taken for public use without just compensation." These provisions have been incorporated, in substance, into all our state constitutions. They are simple and comprehensive in themselves, and I do not perceive that they derive any additional force or meaning by tracing their origin to *Magna Charta* and the later fundamental statutes of Great Britain. In *Magna Charta*, they were wrested from the king as restraints upon the power of the crown. With us they are imposed by the people as restraints upon the power of the legislature.

No doubt, it seems to me, can be admitted of the meaning of these provisions. To say, as has been suggested, that "the law of the land," or "due process of law," may

Wynehamer *against* The People.

mean the very act of legislation which deprives the citizen of his rights, privileges or property, leads to a simple absurdity. The constitution would then mean, that no person shall be deprived of his property or rights, unless the legislature shall pass a law to effectuate the wrong, and this would be throwing the restraint entirely away. The true interpretation of these constitutional phrases is, that where rights are acquired by the citizen under the existing law, there is no power in any branch of the government to take them away; but where they are held contrary to the existing law, or are forfeited by its violation, then they may be taken from him — not by an act of the legislature, but in the due administration of the law itself, before the judicial tribunals of the state. The cause or occasion for depriving the citizen of his supposed rights must be found in the law as it is, or, at least it cannot be *created* by a legislative act which aims at their destruction. Where rights of property are admitted to exist, the legislature cannot say they shall exist no longer; nor will it make any difference, although a process and a tribunal are appointed to execute the sentence. If this is the "law of the land," and "due process of law," within the meaning of the constitution, then the legislature is omnipotent. It may, under the same interpretation, pass a law to take away liberty or life without a preëxisting cause, appointing judicial and executive agencies to execute its will. Property is placed by the constitution in the same category with liberty and life.

Clear as this matter stands upon principle, it is equally well settled by authority. Chief Justice Gibson, of Pennsylvania, speaking of a similar clause in the constitution of that state, and of the right of property as protected by it, said: "What law? Undoubtedly a preëxisting rule of conduct, not an *ex post facto* rescript or decree made for the occasion. The design of the convention was to exclude arbitrary power from every branch of the government; and there would be

no exclusion of it if svch rescripts or decrees were to take. effect in the *form of a statute*. The right of property has no foundation or security but the law ; and when the legislature shall successfully attempt to overturn it, even in a single instance, the liberty of the citizen is no more." (*Norman* v. *Heist*, 5 *Watts & Serg.*, 193.)    And Chief Justice Bronson, of this state, in *Taylor* v. *Porter* (4 *Hill*, 145), said : " The words ' law of the land,' as here used, do not mean a statute passed for the purpose of working the wrong.    That construction would render the restriction absolutely nugatory, and turn this part of the constitution into mere nonsense." And again : " The meaning of the section, then, seems to be, that no member of the state shall be disfranchised of any of his rights and privileges, unless the matter be adjudged against him upon trial had according to the course of the common law.    It must be ascertained judicially that he has forfeited his privileges, or that some one else has a superior title to the property he possesses, before either of them can be taken from him.    It cannot be done by mere legislation."    Again he adds, speaking of the words " due process of law :" " If the legislature can take the property of A, and give it to B, they can take A himself and either shut him up in prison, or put him to death.    But none of these things can be done by mere legislation."

Chief Justice Ruffin, of North Carolina, in a very able and elaborate judgment, involving the construction and force of a similar clause in the constitution of that state, laid down the doctrine that " the terms ' law of the land,' do not mean merely an act of the general assembly.    If they did, every restriction upon the legislative authority would be at once abrogated."    " In reference," he adds, " to the infliction of punishment and divesting of the rights of property, it has been repeatedly held in this state, and it is believed in every state in the Union, that there are limitations upon the legislative power notwithstanding those words ; and that the clause itself means that such

legislative acts as profess, in themselves, directly to punish persons, or to deprive the citizen of his property without trial before the judicial tribunals and a decision upon the matter of right, as determined by the laws under which it vested, according to the course, mode and usages of the common law as derived from our forefathers, are not effectually ' laws of the land,' for those purposes." ( *Hoke* v. *Henderson*, 4 *Dev.*, 15.)

Chancellor Kent (2 *Com.*, 13), says: " The words, ' law of the land,' as used originally in Magna Charta, in reference to this subject, are understood to mean, due process of law, that is, by indictment or presentment of good and lawful men : ' and this,' says Lord Coke, ' is the true sense and exposition of those words.' The better and larger definition of *due process* of law is, that it means law in its *regular course of administration through courts of justice.*" ( *See also Story on Const.*, 661; 10 *Yerger*, 59 ; 2 *Coke Inst.*, 45–50.)

It is plain, therefore, both upon principle and authority, that these constitutional safeguards, in all cases, require a judicial investigation, not to be governed by a law specially enacted to take away and destroy existing rights, but confined to the question whether, under the preëxisting rule of conduct, the right in controversy has been lawfully acquired and is lawfully possessed. A proposition so obvious would have deserved less consideration, if a singular misapprehension in regard to it did not appear to have prevailed in a decision not now before us for review, but upon the act under examination, pronounced in another branch of the supreme court. (*People* v. *Quant*, 12 How. Pr. R. 83.)

We are brought, then, directly to the question, does the " Act for the prevention of intemperance, pauperism and crime," in a just constitutional sense, deprive the citizens of this state of their property in intoxicating liquors? We have already seen that this species of property is just as inviolable as any other. That by the operation of this law, its commercial value is annihilated ; that it cannot be sold ; that it is

unlawful to keep it; that all legal protection is withdrawn from it; and that it becomes a public nuisance. Is the owner "deprived" of it within the fair meaning of the constitution? I bring the act to this particular test, because if it can stand with this clause of the constitution, it can with every other.

Now, I can form no notion of property which does not include the essential characteristics and attributes with which it is clothed by the laws of society. In a state of nature property did not exist at all. "Every man might then take to his use what he pleased, and retain it if he had sufficient power; but when men entered into society, and industry, arts and sciences were introduced, property was gained by various means, for the securing whereof proper laws were ordained." (*Tomlin's Law Dic.*, Property; 2 *Bl. Com.*, 34.) Material objects, therefore, are property in the true sense, because they are impressed by the laws and usages of society with certain qualities, among which are, fundamentally, the right of the occupant or owner to use and enjoy them exclusively, and his absolute power to sell and dispose of them; and as property consists in the artificial impression of these qualities upon material things, so, whatever removes the impression destroys the notion of property, although the things themselves may remain physically untouched.

Nor can I find any definition of property which does not include the power of disposition and sale, as well as the right of private use and enjoyment. Thus Blackstone says, (1 *Com.*, 138): "The third absolute right of every Englishman is, that of property, which consists in the free use, enjoyment and *disposal* of all his acquisitions, without any control or diminution, save only by the laws of the land.' Chancellor Kent says, (2 *Com.*, 320): "The exclusive right of using and *transferring* property follows as a natural consequence from the perception and admission of the right itself." And again, (*p* 326): "The power of *alienation of*

*property* is a necessary incident to the right, and was dictated by mutual convenience and mutual wants." By another author, property is defined as an " exclusive right to things, containing not only a right to use those things, but a right to dispose of them, either by exchanging them for other things, or giving them away to any other person without consideration, or even throwing them away." (*Bouvier's Law Dict.*, *tit. Property.*) These definitions are in accordance with the general sense of mankind. Indeed, if any one can define property eliminated of its attributes, incapable of sale, and placed without the protection of law, it were well that the attempt should be made.

The statute under consideration, without reference to its provisions for the seizure and physical destruction of intoxicating liquors, by force of its prohibitions alone, sweeps them from the commerce of the state, and thus annihilates the quality of sale, which makes them valuable to the owner. This is destructive of the notion of property. I need, perhaps, take no further notice of their qualified vendibility for the sacrament, and the other special uses named in the act. These are only the occasional and incidental uses of the article. It is the general and primary use which is aimed at. It is the mass of property which is struck down ; and the possible conservation of an extremely insignificant portion cannot change the character of the law. No ingenuous advocate of the law will deny that its great characteristic is prohibition, intended to turn back from the channels of commerce important masses of property, and thus, by suppressing the use, to prevent the abuse. To regard the act in any other light would be a fraud upon its entire policy, and upon the views and motives in which it must be supposed to have had its origin. And in order to a full view of the spirit and intent of the law, to simple prohibition, we must add its penalties and its other connected and dependent clauses, the whole forming one scheme and all tending, with fatal accuracy,

to the destruction of property in intoxicating liquors within this state.

Unless, therefore, the right of property in liquors is denied altogether, and this has never been done, or unless they can be distinguished from every other species of property, and this has not been attempted, the act cannot stand consistently with the constitution.  The provisions of the constitution should receive a beneficent and liberal interpretation, where the fundamental rights of the citizen are concerned.  But, in the case before us, its plain and obvious meaning is enough.  "No person can be deprived of his property without due process of law" by the legislature or any other power of the government.  When a law annihilates the value of property, and strips it of its attributes, by which alone it is distinguished as property, the owner is deprived of it according to the plainest interpretation, and certainly within the spirit of a constitutional provision intended expressly to shield private rights from the exercise of arbitrary power.

I have not reached this result without an attentive examination of the arguments which have been urged in favor of an opposite conclusion.  Such of them as may appear to have most weight, or to have been most relied on, may here be noticed.

Prominent among these suggestions, our attention has been directed to a supposed analogy between the act under consideration and the license and excise laws of this and other states, the constitutionality of which is not questioned.  I think the analogy does not exist.  However difficult it may be to define, with accuracy and precision, the line of separation, there is a broad and perfectly intelligible distinction between what is plainly regulation on the one side, and what is plainly prohibition on the other.  In another case great difficulty may attend the inquiry, but not greater certainty than often attends judicial investigations.  The inquiry is essentially judicial in its nature ;

and whenever a case of difficulty arises, it must be met and determined upon its special circumstances, and by the aid of such lights as can be obtained. In the present case, the difficulty suggested is not perceived. The statute we are examining passes the utmost limit of regulation, and does not even wear a disguise. It is plainly prohibitory in every feature, and in its entire scope and policy. Some of the excise acts referred to were of great stringency, considered as regulations merely of traffic in intoxicating liqr.ors; but none of them totally prohibited their sale as a beverage, or denied to them, as such, the essential qualities of property, or placed them without the protection of the laws.

It is certain that the legislature cannot totally annihilate commerce in any species of property, and so condemn the property itself to extinction. It is equally certain that the legislature can regulate trade in property of all kinds. Neither of these propositions is denied; but they necessarily lead to another—that between regulation and destruction there is somewhere, however difficult to define with precision, a line of separation. All reasoning, therefore, in favor of upholding legislation which belongs to one class, because it is often difficult to distinguish it from that which belongs to the other, must be fallacious, because it is simply reasoning against admitted conclusions.

The provision in the federal constitution, declaring that no state shall pass laws impairing the obligation of contracts, and the course of judicial decision under that provision, may be referred to as illustrating the distinction between legislation which is remedial merely, and that which is subversive of the rights intended to be saved. Under this provision the constitutionality of state laws has often been examined, and the difficulty of distinguishing between statutes which regulated the remedy and those which impaired or subverted the right has been great and acknowledged. But the distinction itself has been steadily maintained. Neither the federal nor the state courts have

ever shrunk from the inquiry; and laws which transcended the limits of regulation merely, and directly or indirectly invaded the right, have been uniformly adjudged to be void.

Nor could we escape the kindred inquiry in the case before us, although it were attended with much greater difficulty than we believe it to be. Does the statute under consideration simply regulate, or does it destroy an admitted species of property, in which millions of value are invested? As this question is answered, the act must stand or fall; and in my judgment but one answer can be given.

Besides the license and excise laws, our attention has been drawn to other legislative enactments, producing in their result great injury to private property, the constitutionality of which has been admitted or adjudged. The embargo act of congress in 1807 (2 *Statutes at Large*, 451), is mentioned as one of these examples of legislation. I do not perceive any analogy which can influence the present question. That was an act which simply prevented "all ships and vessels in ports and places within the limits or jurisdiction of the United States" from sailing upon any enterprise of *foreign* commerce. It is not important to inquire under what particular clause of the federal constitution the power was derived to enact such a law. That it went to the utmost verge of constitutional power has been universally conceded. (3 *Story on the Constitution*, 163.) It is enough for the present purpose to say, that it was recommended and adopted as a measure of *protection* to property, and not of annihilation. In the language of Justice Story (*id.*, 161), "It was avowedly recommended as a measure of safety for our vessels, our seamen and our merchandise, from the threatening dangers from the belligerent powers of Europe." In other words, it was an act of conservation and not of destruction, although in its effect it bore with great severity upon the interests of the commercial states and upon the property of individuals. It did not aim at the extinction of any species of property, or of

any of its attributes.  If congress, proceeding upon a theory that all foreign commerce was injurious to the interests of the nation and the morals and habits of the people, had passed an act intended to destroy it perpetually, and for that purpose confiscating ships and vessels, prohibiting their sale, making it unlawful to keep them with intent to sell, or keep them at all, and declaring them a nuisance, and such a law had been adjudged valid, then, and I think not till then, an analogy might be traced having something to do with the question before us.

Statutes conferring upon municipal corporations powers which, in their execution and ultimate result, inflict incidental or consequential injury upon the property of individuals —injury for which it is said the law affords no remedy— have been adjudged constitutional.  In legislation of this kind it is also supposed some warrant can be found for the act under consideration.  Here, again, the analogy fails. Laws of this character proscribe no species of property. They may injure it in their remote and accidental result, but they do not, like this act, say it shall not be allowed to exist at all, or strike directly at the qualities and attributes, without which it can have no legal existence.  The constitutional requirement is, that no person shall be *deprived of his property*, and that private property shall not be taken for public use without just compensation.  It is nowhere declared that, in the exercise of the admitted functions of government, private property may not receive remote and consequent injury without compensation.  (*See Radcliff's Executors* v. *The Mayor of Brooklyn*, 4 *Comst.*, 195.)

The authorized destruction of buildings in the city of New-York, by direction of the mayor and aldermen, in order to prevent the spread of conflagration (2 *R. L. of* 1813, *p.* 368, § 81), has been referred to as a constitutional exercise of legislative power, which deprives a citizen of his property.  It is enough to say of such statutes, that they are founded upon and are mere regulations of the com-

mon law right of any person to destroy property in a case of immediate and overwhelming necessity to prevent the ravages of fire or pestilence. (2 *Kent Com.*, 339; *Russell v. The Mayor, &c., of New-York*, 2 *Denio*, 461; 17 *Wend.*, 285; 25 *id.*, 157.) Statutes of this description merely appoint a municipal agent to judge of the emergency, and direct the performance of acts which any individual might do at his peril without any statute at all. If such legislation can prove anything to the present purpose, it would show that these powers of destruction may be invoked in order to reform the morals and habits of society, and therefore that authorized agents of the legislature, or individuals without authority, may go forth on a roving commission to seize and destroy all intoxicating liquors within the borders of the state, and plead an overruling necessity as a justification of their lawless acts. This would be a mission which philanthropists and reformers have not yet undertaken, and certainly which no judge or lawyer would defend.

Other examples of legislation have been cited, which may be grouped together and considered at a single view. Laws of quarantine, which detain ships for a limited period coming from places where pestilential diseases exist; laws against smuggling, which forfeit the goods and the vessels in which they are conveyed for non-payment of impost duties; laws against gambling, which forfeit the tools and implements with which the offence is committed; laws against horse racing, under which it is said the horses unlawfully used are forfeited; laws against selling liquors to Indians, under which the liquors themselves may be forfeited. Examples of this sort are supposed to have a peculiar application to the question, because, by the force of statutes of admitted validity, property is specifically forfeited, and so the owner deprived of it. There is, however, a fallacy in all reasoning and illustration from such sources, which can be readily exposed.

And the precise and fatal difficulty in the argument is, that the only resemblance between the statutes referred to, and the one under consideration, is in the *character of the punishment.* The prohibitions themselves are totally unlike, and relate mostly to different subjects. That the punishment for violating such prohibitions is similar, or even the same, amounts to nothing, when the question is whethei the prohibitions themselves, or any one of them, is constitutional or valid. Take, for example, the instance of smuggling. No one doubts the power of congress to prohibit the importation of goods without the payment of duties, nor, consequently, that the offender may be punished by a forfeiture of the goods, by pecuniary fine or by imprisonment. But whether the legislature of this state has the power to prohibit the keeping or sale of property in general, or any particular species, is the precise question now to be determined. When that is first established, then the owner who violates the prohibition may lose his property, or be fined, imprisoned, banished or put to death.

It is certainly a simple proposition, that an admitted public offence against a constitutional statute may be punished by loss of property, of money, of liberty or of life; but how this tends to show that another statute, prohibiting things of a totally different character, and similar only in its sanction or penalty, is valid, and the offence itself constitutionally created, is what I have been unable to perceive. In a word, to trace an analogy between two statutes in the manner of enforcing them, or punishing the offender, does not advance a step toward proving that either the one or the other is constitutional, or the contrary.

The illustration from the statutes referred to, and all others which can be referred to, fails for another reason of great significance, which seems to have been overlooked by those who assert the validity of the prohibitory law. It is an entire misconception of the law itself to say that the species of property to which it relates is *forfeited by a viola-*

*tion* of its provisions. It is simply *extinguished* by the force of the prohibitions themselves. In other parts of the act, pecuniary penalties and imprisonment are inflicted, but the loss of property is not exacted as a forfeiture at all in any just or ordinary sense of the term. It is quite absurd to say of a law, which enacts in substance that property of a particular species shall no longer exist, that it imposes a forfeiture of such property as the punishment for violating the prohibition. There is no offence, except the misfortune of being the owner. A forfeiture of goods implies a title to them, good against all the world; but if this law is valid, then the owner has no title to lose. Analogies for such legislation will be sought for in vain.

In respect to one of the statutes which have been mentioned, that which prohibits the sale of intoxicating liquors to Indians, it should be further observed, that Indians are considered as persons *inops consilii* under the tutelage of government, and in the same category with minors, habitual drunkards, &c. These classes of persons are particularly the subjects of governmental care; and to concede that the legislature may constrain or prohibit the sale of spirituous liquors to them, is only admitting that it may regulate traffic in any species of property — an admission which suggests the distinction already sufficiently considered between the power to regulate and the power to destroy.

It has been said, also, that the admitted power of taxation may be so exercised under legislative authority as greatly to impair the value of private property. This is undoubtedly true, but it throws no light upon the present question. The power may be wisely or unwisely, justly or unjustly, exercised; but, as a power, it rests upon the theory that full compensation is received by the individual in the benefit conferred by the tax itself. The support of government, and other objects of public utility promoted by taxation, are supposed to return to the individual the value which has been taken from him as his share of the public

burden. This is neither depriving a man of his property, in a constitutional sense, nor taking it for public use under the right of eminent domain. Again, it may be suggested, if, in a given case, it could be plainly seen that the confiscation and extinction of a species of property were the essential object of a statute, it should be declared unconstitutional, although disguised under the forms of taxation.

It has also been supposed that some authority for legislation of this kind is found in the observation of one or two of the judges of the supreme court of the United States, delivered where the license laws of Massachusetts, Rhode Island and New Hampshire were examined in that court. (5 *Howard*, 504.) This is quite a mistake. The question involved and determined was, that the excise laws of those states did not conflict with the authority of congress to regulate commerce with foreign countries and among the states. Whatever was said beyond that was, of course, *obiter dicta* merely, and even as such had no reference to the limitations of legislative power contained in state constitutions.

It is scarcely necessary, perhaps, to observe, that in the views which have been expressed, it is not intended to narrow the field of legislative discretion in regulating and controlling the traffic in intoxicating liquors. We only say that, in all such legislation, the essential right of the citizen to his property must be preserved; a right which includes the power of disposition and sale, to be exercised under such restraints as a just regard both to the public good and private rights may suggest.

I am not insensible to the delicacy and importance of the duty we assume in overruling an act of the legislature, believed by so many intelligent and good men to afford the best remedy for great and admitted evils in society; but we cannot forget that the highest function intrusted to us is that of maintaining inflexibly the fundamental law. And believing, as I do, that the prohibitory act transcends the

3 KERN.—26

constitutional limits of the legislative power, t must be adjudged to be void.

The judgments of the supreme court and of the court of sessions must, therefore, be reversed.

A. S. JOHNSON, J.   This proceeding was instituted under the provisions of the act for the prevention of intemperance, pauperism and crime.   The sections which particularly relate to it are substantially these, omitting such parts as do not bear upon this case : " It shall be the duty of every sheriff, under sheriff, deputy sheriff, constable, marshal or policeman, to arrest any person whom he shall see actually engaged in the commission of any offence in violation of the 1st section of this act, and to seize all liquor kept in violation of said section, at the time and place of the commission of such offence, together with the vessels in which the same is contained, and forthwith to convey such person before any magistrate of the same city or town, to be dealt with according to law, and to store the liquor and vessels so seized in some convenient place, to be disposed of as hereinafter provided. It shall be the duty of every officer by whom any arrest and seizure shall be made, under this section, to make com· plaint on oath against the person arrested, and to prosecute such complaint to judgment and execution." (*Laws of* 1855, *p*. 340, § 12.)   " All liquors and vessels in which they are contained, which shall have been found and seized in the possession of any person who shall have been arrested for violating any provision of the 1st section and not claimed by any other person, shall, upon conviction of such person of such offence, be adjudged forfeited." (§ 13.)   When any liquor seized under any provision of the act shall be adjudged forfeited, as provided in any section of the act, it shall be the duty of the magistrate (after the determination is become final) forthwith to issue a warrant commanding that the liquor be destroyed.   The officer to whom the warrant shall be delivered is to destroy it and make a

return of the destruction, and then an execution is to be issued to sell the vessels which contained the liquor. (§ 10.) Every justice of the peace, police justice, county judge, city judge (certain other officers in New-York), and, in all cities where there is a recorder's court, the recorder, has power to issue process, to hear and determine charges, and punish for all offences under the act, and to hold courts of special sessions for the trial of such offences. The section proceeds: "Such court of special sessions shall not be required to take the examination of any person brought before it upon charge of an offence under the act, but shall proceed to trial as soon thereafter as the complainant can be notified." Power to adjourn, for good cause, is given for not exceeding twenty days. At the time of joining issue, and not after, either party may demand trial by jury, in which case the magistrate is to cause a jury to be summoned and empanneled, as in other criminal cases in courts of special sessions. (§ 5.) No person who shall have been convicted of any offence against any provision of the act, or who shall be engaged in the sale or keeping of intoxicating liquors, contrary to the act, shall be competent to act as a juror upon any trial under any provision of the act. (§ 16.) Upon the trial of any complaint under the act, proof of the sale of liquor shall be sufficient to sustain an averment of an unlawful sale, and proof of delivery shall be *prima facie* evidence of sale. (§ 17.) A violation of any provision of the 1st section is made a misdemeanor. The guilty party is to forfeit all liquors kept by him in violation of the section, and is to be further punished by a fine of $50 for the first offence; for the second, by a fine of $100 and thirty days' imprisonment; for the third and every subsequent offence, by a fine not less than $100, nor more than $250, and by imprisonment for not less than three, nor more than six months. The defendant is likewise to pay all costs and fees provided in the act; and in default of payment of any such fine, costs and fees, or any part thereof,

the defendant is to be committed until the same are paid
" not less than one day per dollar of the amount unpaid.'
(§ 4.) Such is the machinery of legal process by which
according to the act, any person who violates the prohi-
bition of the 1st section is to be brought to punishment,
when the proceeding takes the form of a personal prose-
cution. Other and not less stringent and extraordinary
methods of procedure are provided when the prosecution is
directed against the liquor alone to procure its destruction.
With these, however, we have in this case no cause to
occupy ourselves.

The prohibitory clause itself, upon which these proceed-
ings are founded, constitutes the 1st section. Omitting
certain exceptions from the prohibition, which will be after
wards noticed, it provides that intoxicating liquor shall not
be sold, or kept for sale, or kept with intent to be sold, by
any person in any place whatsoever; that it shall not be
given away, nor be kept with intent to be given away, in
any place whatsoever, except in a dwelling-house, in no
part of which any tavern, store, grocery, shop, boarding-
house or victualing-house, or room for gambling, dancing,
or other public amusement or recreation of any kind is
kept; that it shall not be kept or deposited in any place
whatsoever, except in such a dwelling-house as is above
described, or for sacramental purposes in a church or place
of worship; or in a place where either some chemical, or
mechanical, or medicinal art, requiring the use of liquor, is
carried on as a regular branch of business, or while in
actual transportation from one place to another, or stored
in a warehouse prior to its reaching the place of its desti-
nation. By an exception in this same section, liquor may
be given away as a medicine by physicians pursuing the
practice of medicine as a business, or for sacramental pur-
poses. The section concludes with a provision that it shall
not apply to liquor, the right to sell which in this state is
given by any law or treaty of the United States.

By §§ 2 and 3, persons answering the description, doing the acts and taking the oaths prescribed therein, may be licensed to keep for sale, and sell intoxicating liquor and alcohol for mechanical, chemical or medicinal purposes, and wine for sacramental use. By § 22, the act is not to be construed to prevent the sale of cider in quantities not less than ten gallons; nor to prevent the manufacturer of alcohol, or of pure wine from grapes grown by him, from keeping or from selling such alcohol or wine, nor the importer of foreign liquor from keeping or selling the same in the original packages to any person authorized by the act to sell such liquors; nor to prohibit the manufacture or keeping for sale, nor the selling burning fluids of any kind, perfumery, essences, drugs, varnishes, nor any other article which may be composed in part of alcohol or other spirituous liquors, if not adapted to use as a beverage, or in evasion of this act.

The foregoing clauses contain, in substance, the prohibition of the act, with the exceptions which qualify its effect.

Two other provisions are necessary to be quoted, as they bear upon the rights which the owner of liquor has in it, and the modes in which he may assert those rights. The first is at the close of § 16, and declares " that no person shall maintain an action to recover the value or possession of any intoxicating liquor sold or kept by him, which shall be purchased, taken, detained or injured by any other person, unless he shall prove that such liquor was sold according to the provisions of the act, or was lawfully kept and owned by him." The other clause is at the end of § 25, and provides that " all liquor kept in violation of any provision of the act shall be deemed and is hereby declared to be a public nuisance."

The question whether this act is within the authority conferred by the people of this state upon the legislature, or whether it is in conflict with the restraints which the people have in the constitution imposed upon the law-

making power, is presented by the case before us. 'It is, perhaps, not absolutely necessary to the decision of the cause that we should pass upon this question in its broadest aspect. It has not been usual for the courts of the United States to consider questions of constitutional law, when the particular case before them could be disposed of on other grounds. I have no doubt that this practice is grounded upon a wise consideration of the delicate nature of the authority which courts of justice exercise in declaring the acts of the legislative power void, as being in conflict with the constitution. The practice, however, rests in the discretion of the judges, and may therefore be departed from when the public interests seem to require that course. It is not unknown to us that much controversy has existed in respect to the constitutionality of this law, and that the whole body of the community is divided in opinion upon it; that these different opinions are maintained with great ardor by those who entertain them, and that very important interests, both public and private, depend upon the solution which the question shall receive at our hands. The question has been presented to the supreme court, at different general terms, and conflicting decisions have resulted, so that no private person, nor any public officer, can say what is his duty in the premises. This state of things not only allows us to depart from the ordinary practice, but, in my judgment, makes it our imperative duty to consider and finally dispose of the questions involved.

In this state, all power which is exercised over the people is derived from them, whether it be legislative, executive or judicial; they have conferred it, or it can have no legal existence. To the legislature they have entrusted " the legislative power of this state," as the words of their grant declare. ( *Cons., art.* 3, § 1.) In the same instrument they have imposed upon all the agents to whom they have committed the powers of government, certain restrictions, which, by the intrinsic and original power of the people,

limit the exercise of authority. Some of these restrictions are, in terms, imposed upon the legislative power ; others, equally restrictive upon legislative and executive authority, are expressed in form of declarations of rights belonging to the people.

In my judgment, legislative power is subject to no other control. In every organized society there must exist, somewhere, an ultimate power of determining what the interest of the people requires, which power having been exercised, the decision is subject to no review, save by the whole body of the society. Upon no part of human action does the law operate more directly or more legitimately than in respect to actions which are regarded as hostile to the public welfare. In respect to such actions, where no constitutional limit is imposed upon legislative power, legislation is supreme. The right to make such laws lies at the very foundation of society, and is entrusted, and ought to be entrusted, as I think, to the law-making power. The determination as to what actions shall be forbidden, necessarily involves discretion, to be exercised in view of all the circumstances which, at the time, are operating upon the welfare of the people. Of such questions, the legislature which exercises the power of the people, which is in immediate communication with them, which knows both their desires and their needs, is the ultimate judge. I am speaking solely of the question of power. I am not to judge of the wisdom of the laws under review, or of their reasonableness or abstract justice. Sitting in the exercise of mere judicial power, which is strictly limited to answering the question, what *is* the law, and has not been entrusted with saying what it ought to be, I have no authority to weigh the justice of legislation, and to allow or disallow it as I shall find the scale to turn. Certainly, that which the interest and welfare of the people required to be made law was proper to be enacted, and was within the scope of legislative power, if no constitutional inhibition exists

If a court is to judge of such a question at all, it must go over the same field upon which the legislature has acted. It must consider the occasion of the law, the existence of the evil, the suitableness of the remedy. " A person exer· cising a judicial capacity is neither to apply to original justice, nor to a discretionary application of it. He goes to justice and discretion only at second hand, through the medium of some superiors. He is to work, neither upon his opinion of the one nor of the other, but upon a fixed rule, of which he has not the making, but singly and solely the application to the case." Whether a given action shall be prohibited, and under what penalty, whether loss of life, or liberty, or of fine, must depend upon an infinite variety of facts, and upon the consideration of the evil the action occasions or is likely to occasion to the people. What machinery has a court of justice, sitting to determine questions of law, with which to investigate such a question? Upon this subject, I can add nothing to the strength and clearness with which that, which I regard as the true legal view of the powers and duties of judges, is stated by Senator Verplanck, in *Cochran* v. *Van Surlay* (20 *Wend.*, 381) " It is difficult, upon any general principles, to limit the omnipotence of the sovereign legislative power by judicial interposition, except so far as the express words of a written constitution give that authority. There are, indeed, many dicta, and some great authorities, holding that acts contrary to the first principles of right are void. The principle is unquestionably sound, as the governing rule of a legislature in relation to its own acts, or even those of a preceding legislature. It affords a safe rule of construction for courts, in the interpretation of laws admitting of any doubtful construction, to presume that the legislature could not have intended an unequal and unjust operation of its statutes. Such a construction ought never to be given to legislative language, if it be susceptible of any other more conformable to justice; but if the words be positive and without

ambiguity, I can find no authority for a court to vacate or repeal a statute on that ground alone. But it is only in express constitutional provisions, limiting legislative power and controlling the temporary will of a majority by a permanent and paramount law, settled by the deliberate wisdom of the nation, that I can find a safe and solid ground for the authority of courts of justice to declare void any legislative enactment."

From a pretty early period the evils of drunkenness have attracted legislative attention. Frequent instances of legislation on the subject are to be found among the English and our colonial laws. With these examples, and with the constant practice of our own government in restraining sales of liquor in small quantities except by license, I feel it difficult to understand how it can be maintained that the use of intoxicating liquors is not a subject upon which legislation can constitutionally take place to prevent injuries to the health and morals of the people; and if it is a proper subject of legislation at all, I do not know where is to be found (unless in the constitution) any fixed rule by which a court can undertake to say that the absolute prohibition of the use of liquors, as a beverage, would be beyond the authority of the legislature. Nor do I find in the constitution anything which can be applied to restrain the passage or affect the validity of such a law. Certainly neither the declaration that " no person shall be deprived of life, liberty or property, without due process of law," or that other, " no member of this state shall be disfranchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers," would have any application to such a law. The right to drink liquor stands upon no higher ground than the right to do many other things which the legislature finds contrary to the public welfare, and can scarcely be secured under those general words, unless upon grounds that would completely tie the hands of the legisla-

ture from nearly all interference with the conduct of men. But the legislature have not seen fit to put their legislation into this form. They have not directly prohibited the use of liquors as a beverage, but have attempted to bring about the result which they had in view, by forbidding substantially the traffic in liquors, except for other purposes than drinking. This prohibition, if enforced, would have a clear tendency to prevent the use of liquors as a drink, because it would render the procurement of them for any such purpose nearly impossible, unless the seller should violate the law. Indeed, the only ways in which liquors could be procured by purchase by any person, without an infraction of the law by some one, upon the construction put by the prosecution upon the terms of the present act, would be either to manufacture them, or perhaps to buy from an importer, in the original packages of importation. If the law in question went no further than to impose such a prohibition upon sales, operating alike upon all the inhabitants of the state, I should find it difficult to say that it, by its own mere force, deprived any person of his liberty or property, within the meaning of the constitution. Such a law would clearly diminish the value of the property, nay, almost deprive it of value, and render it nearly useless, within this state for the purposes of traffic, for which it was mostly acquired, but it would not touch the thing, nor would it destroy the property, considering that term in its legal sense, as descriptive of those rights which men acquired to and over things, and which constitute the legal notion of property.

It is quite obvious that the end which the legislature had in view, assuming that to have been the prevention of the evils of drinking may be attained by direct and also by indirect measures. For instance, prohibiting intoxication would be one means; prohibiting drinking at all would be another, one degree more remote; prohibiting the sale for drinking is still more remote. So legislation may be car-

ried on farther and farther from the object directly in view; as by prohibiting the sale for any purpose; prohibiting the manufacture; prohibiting even the existence of liquor; or even of those things from which liquors can be procured. Now, though the general purpose is entirely legitimate and within the scope of legislative authority, and though direct legislation for the attainment of that end might be free from objection, yet it by no means follows that measures operating remotely, though conducive to the end in view, may not violate the restraints of the constitution.

The purpose, origin and history of declaratory bills of rights are admirably stated by Chancellor Kent, in his Commentaries (2 *Kent's Com.*, § 24, *p.* 1). After stating that the absolute rights of individuals may be resolved into the right of personal security; the right of personal liberty; the right to acquire and enjoy property; he says: "These rights have been justly considered and frequently declared by the people of this country, to be natural, inherent and inalienable." After showing how early and how strenuously they were asserted by our colonial ancestors, he says, that "upon the formation of the several state constitutions, after the colonies had become independent states, it was in most instances thought proper to collect, digest and declare, in a precise and definite manner, and in the shape of abstract propositions and elementary maxims, the most essential articles appertaining to civil liberty and the natural rights of mankind." ( *Id.*, 7.)

"But the necessity in our representative republics of these declaratory codes has been frequently questioned; inasmuch as the government, in all its parts, is the creation of the people, and every department of it is filled by their agents, duly chosen or appointed according to their will, and made responsible for maladministration. It may be observed, on the one hand, that no gross violation of those absolute private rights which are clearly understood and settled by the common reason of mankind is to be appre-

hended in the ordinary course of public affairs; and as to extraordinary instances of faction and turbulence, and the corruption and violence which they necessarily engender, no parchment checks can be relied on as affording, under such circumstances, any effectual protection to public liberty. When the spirit of liberty has fled, and truth and justice are disregarded, private rights can be easily sacrificed under the forms of law. On the other hand, there is weight due to the consideration that a bill of rights is of real efficacy in controlling the excesses of party spirit. It serves to guide and enlighten public opinion; and to render it more quick to detect and more resolute to resist attempts to disturb private right. It requires more than ordinary hardiness and audacity of character to trample down principles which our ancestors cultivated with reverence; which we imbibed in our early education; which recommend themselves to the judgment of the world by their truth and simplicity; and which are constantly placed before the eyes of the people, accompanied with the imposing force and solemnity of a constitutional sanction. Bills of rights are part of the muniments of freemen, showing their title to protection." (2 *Kent's Com.*, 8.)

The clauses of the bill of rights, before cited, together with the provisions in respect to jury trials, contain the substance of the provisions of chap. 29 of Magna Charta. These clauses have always received a large and liberal interpretation in favor of private rights and against power.

The expression, " by the law of the land," is interpreted by Lord Coke to mean " by the due course and process of law" (2 *Ins.*, 46); and this last expression is afterwards expounded to mean by indictment or presentment of good and lawful men, where such deeds be done in due manner, or by writ original at the common law. (2 *Ins.*, 50.) In *Taylor* v. *Porter* (4 *Hill*, 140), and in *Embury* v. *Conner* (3 *Coms.* 511), the meaning of these words was considered by Bronson, J., in the supreme court, and by Jewett, J., in this

court, and they agree in the opinion that, at the least, " due process of law" imports a judicial trial, and not a mere declaration of legislative will by the passing of a law. They agreed further, in holding as both those courts held, that though private property could be taken for public use upon just compensation, yet for uses not public it could not be taken at all, neither by an act of legislation, nor in any other manner; or, as Judge Bronson expressed himself, speaking with reference to the case of *Taylor* v. *Porter*, which presented the question of the constitutionality of taking a man's land to make a private road, " when one man wants the property of another, I mean to say that the legislature cannot aid him in making the acquisition." The same doctrine, in substance, as to the authority of the legislature, was affirmed in this court in *Powers* v. *Bergen* (2 *Seld.*, 358), where the question arose upon an act of the legislature authorizing a sale of lands by trustees not authorized by the will creating the trust. No necessity for the act of the legislature appeared either in the statute or aside from it, either on account of the infancy or other incapacity of the persons living who had vested or contingent interests in the estate, and the court held that the act was not within the powers delegated to the legislature, and that the sale in pursuance of it conferred no title. In that case Judge Jewett, who gave the opinion of the court, cites with approbation the language of Judge Story, in *Wilkinson* v. *Leland* (2 *Peters*, 657), who says " The fundamental maxims of a free government seem to require that the rights of personal liberty and private property should be held sacred. At least no court of justice in this country would be warranted in assuming that the power to violate and disregard them—a power so repugnant to the common principles of justice and civil liberty—lurked under any general grant of legislative authority, or ought to be implied from any general expressions of the will of the people. The people ought not to be presumed to part with rights

so vital to their security and well-being, without very strong and direct expressions of such an intention." The same construction was again given to these words, " due process of law," by Denio and Edwards, JJ., giving the opinion of this court in *Westervelt* v. *Gregg* (2 *Kern.*, 202). I do not refer to these cases as deciding that now before us, but only to show that without judicial investigation, without " due process of law," no act of legislation can deprive a man of his property, and that in civil cases an act of the legislature alone is wholly inoperative to take from a man his property.

An admirable statement of the constitutional doctrine as to the power of the legislature, both in the punishment and in the creation of offences, is contained in the opinion of Chancellor Sanford, in *Barker* v. *The People* (3 *Cow.*, 686): " The power of the legislature in the punishment of crimes is not a special grant, or a limited authority to do any particular thing, or to act in any particular manner. It is a part of ' the legislative power of this state,' mentioned in the first sentence of the constitution. It is the sovereign power of a state to maintain social order, by laws for the due punishment of crimes. It is a power to take life and liberty, and all the rights of both, when the sacrifice is necessary to the peace, order and safety of the community. This general authority is vested in the legislature; and as it is one of the most ample of their powers, its due exercise is among the highest of their duties. When an offender is imprisoned, he is deprived of the exercise of most of the rights of a citizen; and when he suffers death, all his rights are extinguished. The legislature have power to prescribe imprisonment or death as the punishment of any offence. The rights of a citizen are thus subject to the power of the state in the punishment of crimes; and the restrictions of the constitution upon this, as upon all the general powers of government, are, ' that no citizen shall be deprived of his rights, unless by the law of the land or the judgment of

Wynehamer *against* The People.

his peers; and that no person shall be deprived of life,
liberty or property, without due process of law.' " " The
power of the state over crimes is thus committed to the
legislature without a definition of any crime; without a
description of any punishment to be adopted, or to be
rejected, and without any direction to the legislature con-
cerning punishments.   It is, then, a power to produce the
end by adequate means; a power to establish a criminal
code with competent sanctions; a power to define crimes,
and prescribe punishments by laws, in the discretion of the
legislature.   But though no crime is defined in the consti-
tution, and no species of punishment is specially forbidden
to the legislature, yet there are numerous regulations of the
constitution which must operate as restrictions upon this
general power.   The whole constitution must be supported,
and all its powers and rules must be reconciled into concord.
A law which should declare it a crime to exercise any
fundamental right of the constitution, as the right of
suffrage or the free exercise of religious worship, would
infringe an express rule of the system, and would therefore
not be within the general power over crimes.   Particular
punishments would also encroach upon rules and rights
established by the constitution.   Though the legislature
have an undoubted power to prescribe capital punishment,
and other punishments which produce a disability to enjoy
constitutional rights, yet a mere deprivation of rights
would, even as a punishment, be in many cases repugnant
to rules and rights expressly established.   Many rights are
plainly expressed, and intended to be fundamental and invio-
lable in all circumstances.   A law enacting that a criminal
should, as a punishment for his offence, forfeit the right of
trial by jury, would contravene the constitution, and a
deprivation of this right could not be allowed in the form
of a punishment.   Any other right, thus secured as universal
and inviolable, must equally prevail against the general
power of the legislature to select and prescribe punishments.

These rights are secured to all; to criminals as well as to others; and a punishment, consisting solely in the deprivation of such a right, would be an evident infringement of the constitution; and all punishments which do not subvert such rules and rights of the constitution, are within the scope and choice of the legislative power."

The legislature, then, has power to create offences, and to declare in what cases the consequences of loss of life, of liberty or of property, shall be attached to the commission of offences, they being ascertained "by due process of law" to have been committed. But the form of this declaration of right, "no person shall be deprived of life, liberty or property, without due process of law," necessarily imports that the legislature cannot make the mere existence of the rights secured the occasion of depriving a person of any of them, even by the forms which belong to "due process of law." For if it does not necessarily import this, then the legislative power is absolute.

To provide for a trial to ascertain whether a man is in the enjoyment of either of these rights, and then, as a consequence of finding that he is in the enjoyment of it, to deprive him of it, is doing indirectly just what is forbidden to be done directly, and reduces the constitutional provision to a nullity. For instance, a law that any man who, after the age of fifty years, shall continue to live, shall be punished by imprisonment or fine, would be beyond the power of the legislature. It would be so, upon the ground that he cannot be deprived of life, liberty or property, without due process of law, and that the right to live and not be punished for living was put by the declaration of right beyond the power of legislative interference. Upon the same principle, a law which should make it a crime for men either to live in, or rent, or sell their houses, would fall within the same prohibition upon legislative authority. There may, then, in respect to offences attempted to be created by legislation, a question arise capable of being

considered by courts of justice, whether the thing forbidden is an essential part of either of those secured private rights, so essential that without it the right cannot exist at all. Such a question is undoubtedly of the most delicate nature, as well looking to the wide authority of legislation, as to the intrinsic difficulty of distinguishing between the exercise of the clearly existing power to regulate the manner of enjoying these rights and the exercise of an absolute and prohibited power directly to infringe upon them. A court of justice may well hesitate before such a question, and yet is bound to meet it when presented. A similar case of difficulty has arisen in the courts of the United States, in respect to the acknowledged power of the states to regulate remedies for the enforcement of contracts, and the power prohibited to them by the constitution of the United States, of impairing by law the obligation of contracts. There the remedy and the obligation so run into each other, that to draw a line between them seems almost impossible; yet the duty has been performed, and it has been held that, though the remedy may be altered by the state legislature, yet that a substantial and reasonable mode of enforcement, in the ordinary and regular course of justice, must be given to the party injured by the breach of the contract. The cases are stated and examined in *Morse* v. *Gould* (1 *Kern.*, 281). The rule is necessarily indefinite, for the conflicting rules so blend together in practice, that no other than an indefinite rule is possible. The same sort of question is presented in respect to the infringement by legislation of men's private rights, and the regulation of them, and their enjoyment. The substantial right cannot be destroyed; its enjoyment is not an offence, and legislation cannot make it an offence. At the same time the mode of enjoyment, in its broadest sense, is subject to legislation, though it be affected very injuriously, provided a substantial right is left. Now, in respect to liquors, no lawyer can doubt that on the 3d of July they were property,

3 KERN.—27

in which the owner had the same right as in any other article of personal property, nor that since that time they remain property, and that as such they come under the protection which the constitution affords to property. The power of disposition or use in some way, or at least the right to keep and preserve, enters into every notion of legal property. To destroy the power of sale alone does not indeed physically destroy the property, though it takes from it that quality which gives it its chief value and for which its possession is mainly desirable. Still I am not prepared to say that the legislature may not, under the constitution, take away the right of sale to the extent which this act contemplates. But by a general prohibition of sale, irrespective of quantity, and person and purpose, coupled with a prohibition even to keep it, except in a dwelling-house, where no store, &c., is kept, and in places where certain arts and trades are carried on, the legal existence, which the law and the constitution designate as property, is in my judgment broken up, and the private injury is as completely effected as if the thing itself were physically taken away.

The constitution does not make it a condition, on which its protection is extended to property, that its owner shall also own a dwelling-house. They who owned liquor on the 3d of July, and who did not own or could not procure the use of a dwelling-house or other excepted place, were, without any act done on their part, made guilty of a misdemeanor, punishable by fine and forfeiture, unless they destroyed that which, by the same law, was recognized as property. Allowing it to remain where it happened to be was constituted an offence, and there was no way of escape except by destroying the property; for the power to sell, even to persons licensed to sell again, was taken away. That it may appear that this is no overstatement of the case, I will shortly restate the provisions of the law. With the trifling exceptions before granted, liquors are forbidden

to be sold, or kept with intent to be sold, or to be given away, or kept with intent to be given away, except in a dwelling-house, where no tavern, store or place of amusement is kept; or to be kept or deposited anywhere save in such a dwelling-house, or in a church for sacramental purposes, or in some place where a chemical, mechanical or medicinal art is carried on as a business, or while in actual transportation from one place to another, or stored in a warehouse prior to its reaching its place of destination. In addition to these prohibitions, which together constitute a single scheme for dealing by law with this species of property, liquor kept contrary to them is declared to be a nuisance, and for an injury to it, or the taking it away from the owner, he can maintain no action, unless he proves that it was "lawfully kept and owned by him;" and as this lawfulness is made to depend, among other things, in all cases upon the non-existence of an intent to sell, and in some cases upon the non-existence of an intent to give it away, the nearly impossible burthen of making out these negatives is thrown upon the owners. This scheme taken together, in my judgment, is a scheme not of regulation, but of legal destruction of property, which, as much as any other, was under the protection of the constitution. It does not in its effect come short of a law authorizing any officer, or any one, directly to destroy the liquor. Between directly authorizing the destruction, and telling the owner that he shall be fined, and his property destroyed also, if he does not anticipate the action of the law and destroy it himself, I cannot distinguish. If such a law as to liquors can stand, the same provisions may be made as to any other property ; and if such be the power of the legislature, those words, " no person shall be deprived of life, liberty or property, without due process of law," are no longer deserving of a place " among the muniments of freemen, as showing their title to protection."

There is no doubt a seeming anomaly in the result to which I have come, that mere rights of property should stand in the way of criminal legislation. The only solution of the difficulty is to be found in the consideration that it may not have occured to the convention who framed, or to the people who adopted the constitution, that, in one and the same legislative act, an article which had always before been regarded as property, might be recognized as useful for some purposes, not dangerous in itself, nor evil unless used as a drink, capable of sale by some people, and the subject of property in the hands of every one who lawfully acquired it, and yet, that the public interests might be deemed to require that the lawful owner should neither sell it, irrespective of his intent in selling it, nor keep it, irrespective of his intent in keeping it, unless he could procure a mere dwelling-house to keep it in, on pain of fine and imprisonment and forfeiture. Had such a contingency occurred to them, it is altogether probable that they would have provided for it, either by narrowing the protection which the constitution extends to property, equally with life and liberty, if they deemed that expedient, or possibly by providing expressly for such legislation.

The prohibitions of the first section, taken together, and they form but a single scheme and are to be enforced by the same penalties, cannot therefore, in my judgment, be upheld, at least in respect to property which had been acquired while there was no prohibition against the acquisition of such property. The future acquisition the legislature might, in my opinion, control, and I am not disposed to deny that they could have subjected such future acquisitions to the prohibitions this act imposes. But in this act they have made no discrimination. The provisions extend and were clearly meant to extend to all liquors. It is no part of the proof to make out the offence according to the statute, to show that the liquors were acquired after the prohibitions became operative, nor is the fact that they

were previously acquired any defence under the statute. The only way of defending against it, on the ground in question, is by asking to have it declared void. Laws in relation to civil rights are sometimes held to be unconstitutional, in so far as they affect the rights of certain persons, and valid in respect to others. This is done mainly upon the ground that the courts will not construe them to relate to such cases as the legislature had not power to act upon. To statutes creating criminal offences, such a rule of construction ought not to be applied, and I cannot find any trace of its ever having been applied. It is of the highest importance to the administration of criminal justice, that acts creating crimes should be certain in their terms and plain in their application; and it would be in no small degree unseemly that courts should be called upon, in administering the criminal law, to adjudge an act creating offences at one time valid and at another time void. It must, I think, stand as it has been enacted, or not stand at all. In my judgment, therefore, the 1st section of the act in question, with the penal clauses founded upon it, ought to be declared void.

The next question is as to the process of trial, condemnation, forfeiture and punishment, which the act introduces. I doubt much whether the clause of the bill of rights, that no person shall be deprived of life, liberty or property without due process of law, necessarily imports a jury trial as part of all due process. If it does, then, unless all civil proceedings are out of the perview of the provision, and they were not thought to be in *Taylor* v. *Porter* (4 *Hill*, 140), *and Embury* v. *Connor* (3 *Coms.*, 511), it seems difficult to say on what grounds equity proceedings, in which trial by jury is quite unusual, and by which men are often deprived of property, can be sustained. The right to jury trial is secured by other sections of the bill of rights. If this portion gives it in all cases, then the others can hardly stand with it. For, on looking at them, it is apparent that

jury trials were intended to be continued where they had existed, and that cases were contemplated in which jury trials did not and would not exist. I incline to the construction which Chancellor Kent gives in his Commentaries, that "the better and larger definition of due process of law is, that it means law in its regular administration through courts of justice." (2 *Kent*, 13.) But it is not necessary, in my opinion, to pronounce upon this question, because the first part of art. 1, § 2 of the constitution, viz : " The trial by jury in all cases in which it has heretofore been used shall remain inviolate forever," is broad enough and efficacious enough to secure it. The expression, " in all cases in which it has heretofore been used," is generic. It does not limit the right to the mere instances in which it had been used, but extends it to such new and like cases as might afterwards arise. For instance, felonies were triable only by jury. I do not doubt that all new felonies must be tried in that way, and that by force of this section ; for § 6, which provides that no one shall be held to answer for a capital or otherwise infamous crime, except on indictment or presentment of a grand jury, does not, in terms, require a jury trial of the issue on the indictment. The other section does require it, as well in new felonies as in old, because they belong to the class of cases in which, at the adoption of the constitution, such a trial was used. Applying the principle to this case, we find that, from 1830 at least, misdemeanors by violation of the excise laws were not triable in courts of special sessions at all (1 *R. S.*, 682, § 25 ; 2 *R. S.*, 711, § 1), but in courts of general sessions, or of oyer and terminer, which were courts proceeding according to the course of common law. And moreover, even in cases of offences where the special sessions had jurisdiction, the defendant might always, by giving bail, at least after 1830, secure to himself a right to trial by jury in the other courts. It does not at all affect this argument to say, at an earlier period jury trial was not a right in such cases. The course of the law is to enlarge

private right, not to restrict it. When jury trial was given for the first time in such cases, it was bestowed because the legislature desired to extend its protecting influences, and when afterwards the new constitution was adopted, jury trial, in cases where it was then accustomed, received the sanction and protection of the organic law. Writings are to be construed as to the time when they are made; and " heretofore," in this clause, means before 1846, and cannot, to limit its meaning, be carried back to 1777, and confined to the cases which, at that earlier period, were triable by jury.

This act provides that offences prosecuted personally against the offender, and for which he is punishable by fine, by forfeiture and sometimes by imprisonment, shall be tried by any one of numerous inferior magistrates, either without a jury at all, or by a jury of six men, with very peculiar qualifications. ( *Laws of* 1855, *chap.* 231, §§ 5, 16.) This is not what the constitution means by jury trial. ( *Cruger* v. *Hudson R. Railroad*, 2 *Kern.*, 190.) That must be, within the terms of the constitution, a jury of twelve men. The act is entirely inconsistent with the idea that the magistrate is to let the defendant to bail, to answer at another criminal court. Its direction is that he is not to take the examination of the defendant, but is to proceed immediately to a trial, and he is to give judgment, and from his judgment an appeal lies. He can, according to the act, proceed only for the purpose of determining upon the guilt or innocence of the accused, and constitutionally this power could not be conferred upon him; the whole provision, which was made only with a view to this kind of trials, and not for the purpose of holding the offender to answer elsewhere, must fall.

It follows, that the act conferred no jurisdiction upon the magistrate to try the defendant, and that the judgment of the supreme court, reversing that of the justice, must be affirmed.

SELDEN, J.   The question which lies at the threshold of this case, and which should be determined in advance of every other, is whether the act for the prevention of intemperance, pauperism and crime, considered in reference to its object, the means adopted to secure that object, and its alleged effect in virtually annihilating a large amount of property, is void, as being without the pale of legislative power.   It is claimed, 1. That irrespective of any positive restrictions, the principles of natural equity and justice set bounds to the power of the legislature, which are transcended by this law; and 2. That it is in conflict with the express provisions of the constitution.

In examining this subject, speculative opinions in regard to the wisdom of the act, or the beneficial results likely to flow from it, can have nothing whatever to do with a question which depends upon abstract principles of governmental law; principles which cannot be moulded to meet the views or interests of any portion of the people.   It is a question not of expediency, but of power.

Every sovereign state possesses, within itself, absolute and unlimited legislative power.   It is true that, as government is instituted for beneficent purposes and to promote the welfare of the governed, it has no moral right to enact a law which is plainly repugnant to reason and justice. But this principle belongs to the science of political ethics, and not that of law.   There is no arbiter, beyond the state itself, to determine what legislation is just.   Whatever, therefore, is so declared by the ultimate power of a state, as there can be no appeal, must, in view of the law, be taken to be just and right.   The union of the functions of making and deciding upon laws constitutes, of necessity, absolute legislative power.   While, therefore, the right of a sovereign state to pass arbitrary and tyrannical laws may, its legal power cannot be denied.   This is self-evident, and needs no proof.   I speak, of course, of a state as a whole,

where all its powers are concentrated in the hands of the people at large, or of one or more of its members.

It follows that if a society or people, wishing to form an organized government, should simply create the three essential departments, vesting the whole executive power in one, the legislative in another, and the judicial in a third, as the three departments combined would possess all the powers which belong to the people in their collective capacity, the legislative department could make any law which the people themselves could have made, arbitrary or otherwise; unless, under such a distribution of the governmental powers, some authority is vested in the judiciary, to pass upon the propriety or justice of the laws.

But it is evident that this is a legislative and not a judicial power. It is necessarily to be exercised, in the first instance at least, when the law is passed, and obviously constitutes the most essential portion of the duty of the legislature itself. To suppose the same power vested in the judiciary, tends to confound the distinction between the two departments. Besides, when exercised by the latter, it becomes a supervisory and appellate power, and thus virtually subversive of all legislation. It is clear, therefore, in my judgment, that in a perfectly natural and simple distribution of the governmental powers, it is not within the province of the judiciary to pronounce any act of the legislature void. It may, however, acquire this right through an artificial distribution of those powers, by means of the organic law.

Let us look, then, at our state constitution. Section 1, art. 3, declares that "The legislative power of this state shall be vested in a senate and assembly." This means, of course, the whole legislative power. The words are general and unlimited; nothing is reserved. It was decided by this court, in the case of *Barto* v. *Himrod* (4 *Seld.*, 483), that the people had parted with all their power of legislation, except in the single case provided for in art. 7, § 12.

Why, then, as it has been shown that the people could make any law, just or unjust, is not the legislature equally absolute? It is because, by other clauses in the constitution, hereafter to be noticed, a portion of this absolute power has been transferred to the judiciary. Not, it is true, in direct terms; but the constitution being the result of legislation by the people themselves, before parting with their power, is the paramount law. When, therefore, any law passed by the legislature conflicts with this, the judiciary pronounces between them, as it does between the acts of two successive legislatures, and the paramount law prevails. It will be seen that in this mode a restriction upon the power of the legislature is effected, without confounding the distinction between the two departments, as the judiciary continues to exercise only its appropriate judicial functions.

To determine, then, the extent of the law-making power, we have only to look to the provisions of the constitution. It has, and can have, no other limit than such as is there prescribed; and the doctrine that there exists in the judiciary some vague, loose and undefined power to annul a law, because in its judgment it is " contrary to natural equity and justice," is in conflict with the first principles of government, and can never, I think, be maintained. I am aware that some eminent judges, when the question was not before them, have expressed a belief in the existence of such a power; but no court has ever, I believe, assumed to declare an explicit enactment of the legislature void on that ground.

Blackstone, in his Commentaries, after referring to the doctrine advanced by some other writers on this subject, that acts of parliament " contrary to reason" are void says. " But if the parliament will positively enact a thing to be done which is unreasonable, I know of no power in the ordinary forms of the constitution that is vested with power to control it; and the examples usually alleged in

support of this sense of the rule do none of them prove that when the main object of a statute is unreasonable, the judges are at liberty to reject it; for that were to set the judicial power above the legislative, *which would be subversive of all government.*" (1 *Bl. Com.*, 91.) Christian, in his commentary upon this passage, says: " When the signifi- cation of a statute is manifest, *no authority* less than that of parliament can 'restrain its operation.*" (*See note to Bl.*) These authorities, it is true, have reference to the British constitution; but the following relate to those of our own country. Lieber, in his work on Civil Liberty and Self- Government, says that the state legislatures have " the right, as a general rule, to do all that seems necessary for the general welfare, and is not *specially prohibited.*" He suggests no exceptions. (*See chap.* 15, § 25.) Mr. Justice Iredell, in the case of *Calder* v. *Bull* (3 *Dall.*, 386), where this question was incidentally considered, uses the following emphatic language: " If, then, a government, composed of legislative, executive and judicial departments, were estab- lished by a constitution which imposed no limits on the legis- lative power, the consequence would inevitably be, that whatever the legislative power chose to enact would be law- fully enacted, and the judicial power could never interpose to pronounce it void." Chief Justice Church, of Connecticut, also, in the case of *The City of Bridgeport* v. *The Housatonic Railroad Company* (15 *Conn. R.*, 475), expresses his views thus: " There may not often be any great difficulty in determining what are the principles of natural justice, nor what would tend to undermine that which theorists may suppose to be the fundamental principles of the social com- pact, especially by those who acknowledge the precepts and obligations of revealed religion; yet these principles are not always of easy and undoubted application to the infinitely varied forms of human action; and we know of no other municipal power which can more safely make such application than the legislature; and as a court,

although we might dissent from its conclusions, yet *we dis-claim any right to disregard them* for no other reason than that we might consider them unreasonable, impolitic or unjust." I agree with the learned chief justice, that this power of determining what laws are expedient and just, which must of necessity be lodged somewhere, may be as safely reposed in the legislature, which returns its power so frequently through the elections into the hands of the people, as in the judiciary. The remedy for unjust legisla-tion, provided it does not conflict with the organic law, is at the ballot-box; and I know of no provision of the consti-tution nor fundamental principle of government which authorizes the minority, when defeated at the polls, upon an issue involving the propriety of a law, to appeal to the judiciary and invoke its aid to reverse the decision of the majority and nullify the legislative power.

This brings me to the consideration of the second ground, upon which it is claimed that the law, as a whole, is void viz: that it is inconsistent with the letter or spirit of the express provisions of the state constitution. The particular clauses with which it is alleged to conflict are those which provide: 1. That "no member of this state shall be dis-franchised or deprived of any of the rights or privileges secured to any citizen thereof, unless by the law of the land or the judgment of his peers." 2. That no person shall "be deprived of life, liberty or property, without due pro-cess of law."

The first of these clauses, which had its origin in Magna Charta, brief as it is, embodies the most essential guarantees against the exercise of arbitrary power which that instru-ment contained. Its meaning, as there used, is plain, when we consider that it was the result of a struggle which had lasted for more than a century between the English people and the Norman kings, who had supplanted the laws and customs of the Anglo Saxons, and established in their place the prerogatives of royalty. The English yeomanry, at

whose instance this clause was inserted, meant by the terms, "law of the land," the ancient Saxon or common law. To put any other construction upon it, would render the clause utterly unmeaning. At that period in English history, the king exercised legislative power; and if by "law of the land" was meant any law which the king might enact, the provision was a nullity. But the meaning was rendered more clear by the paraphrase of this article of Magna Charta, which was inserted in a subsequent statute securing privileges to the people, passed in the reign of Edward III., in which the clause, " but by the law of the land or the judgment of his peers," was changed to the words, " without being brought to answer by due process of law." This change shows that the object of the provision was, in part at least, to interpose the judicial department of the government as a barrier against aggressions by the other departments. Hence, both courts and commentators in this country have held that these clauses, in either form, secure to every citizen a judicial trial, before he can be deprived of life, liberty or property. ( *Hoke* v. *Henderson*, 4 *Dev.*, 1; *Jones* v. *Perry*, 10 *Yerger*, 59; *Taylor* v. *Porter*, 4 *Hill*, 140; *Embury* v. *Conner*, 3 *Coms.*, 511; 2 *Kent Com.*, 13; 3 *Story Com. on the Cons.*, § 1783.)

Does the statute in question, then, deprive any class of citizens of their property, without " due process of law?" Property is the right of any person to possess, use, enjoy and dispose of a thing. The term, although frequently applied to the thing itself, in strictness means only the rights of the owner in relation to it. (*Bouvier's Law Dic.*; 1 *Bl. Com.*, 138; *Webster's Dic.*) A man may be deprived of his property in a chattel, therefore, without its being seized or physically destroyed, or taken from his possession. Whatever subverts his rights, in regard to it, annihilates his property in it. It follows, that a law which should provide in regard to any article in which a right of property is

recognized, that it should neither be sold or used, nor kept in any place whatsoever within this state, would fall directly within the letter of the constitutional inhibition; as it would in the most effectual manner possible deprive the owner of his property, without the interposition of any court or the use of any process whatever.

It may be said that the constitutional provision in question cannot, in the nature of things, apply to a case where a law enacted for beneficent purposes operates directly upon its subject, and thus accomplishes *per se* the end in view; that, in such a case, it is impossible to interpose any judicial action between the enactment and its execution; and that the clause can only apply to cases where there is to be some manual interference with the rights of person or of property. But there is no such limitation in the constitution; and the few guarantees it contains should not be curtailed by any narrow or refined process of interpretation. Such a construction would virtually nullify the provision, as the most oppressive and tyrannical ends may be accomplished by simply withdrawing from individual rights the protection of law. All vested rights to franchises would be placed by this interpretation, so far as the state constitution is concerned, entirely at the mercy of the legislature. To give the clause, therefore, any value, it must be understood to mean that no person shall be deprived, by any form of legislation or governmental action, of either life, liberty or property, except as the consequence of some judicial proceeding, appropriately and legally conducted. It follows, that a law which, by its own inherent force, extinguishes rights of property, or compels their extinction, without any legal process whatever, comes directly in conflict with the constitution.

Does the act in question do this? I shall consider the objections to the first four sections, which embrace the prohibitory features of the act, with the specific penalties annexed to its violation, by themselves, as they have no

necessary connection with those made to the subsequent sections. If these four sections virtually deprive the owners of spirituous liquors of their property, without legal process, they are void, if my interpretation of the constitution is sound.

It is not sufficient that they impair the value of the property in ever so great a degree, because this destroys no right. It leaves to the owner unimpaired his right to keep, to use and dispose of the article. It does not therefore deprive him of any right of property. All regulations of trade, with a view to the public interests, may more or less impair the value of property, but they do not come within the constitutional inhibition, unless they virtually take away and destroy those rights in which property consists; this destruction must be for all substantial purposes total. Not that a merely colorable preservation of some minute and trivial interest would uphold the act. A substantial right of property must be saved, and the provisions must be such as may fairly be considered as intended to regulate rather than subvert and destroy the property.

What, then, is the general scope and object of the first four sections of the act? Plainly to prohibit the sale of intoxicating liquors for all except mechanical, chemical and medicinal purposes, and to limit their sale, for those purposes, to a particular class of persons. Is there anything in these objects which, if properly carried out, would transcend the limits of the legislative power? I think not. The legislature, in my judgment, possess the right to prescribe the places where, the persons by whom, and the purposes for which spirituous liquors may be sold, provided that under color of doing this it does not virtually deprive the owner of his property in them. So far as the places where and the persons by whom sales may be made, this act is perhaps not more stringent than the excise laws which it supercedes. The increase of rigor is in the purposes for which such liquors may now be sold. But the

Wynehamer *against* The People. ·

privilege of selling for " *mechanical, chemical* and *medicinal* purposes" is not, I think, so trivial as to be justly regarded as merely colorable. The consumption for the chemical and mechanical arts must be considerable, and that for medicinal purposes will be found, I apprehend, to be still greater. Besides, as the law would operate to check the · manufacture and importation of liquors, the stock on hand would, if permitted, have been ultimately required for purposes deemed by the law itself legitimate. If, then, the law had suffered the liquors on hand, when it went into effect, to be gradually absorbed by the three privileged uses, the prohibitory features contained in the first four sections would not, I think, have conflicted with the constitution.

But there is one provision in the 1st section of the act which, when taken in connection with the 4th section, cannot, I think, be reconciled with any just views of legislative power. That section declares, in substance, first, that intoxicating liquors, except as afterwards provided, shall neither be sold, or kept for sale or with intent to be sold, in any place whatsoever; nor be given away, or kept with intent to be given away, anywhere but in a private dwelling-house. These provisions, although they abrogate the right of sale, do not prohibit the liquors from being kept, provided no design is entertained of selling them; nor do they prohibit their being used by the owner. So far the section may not conflict with the constitution. But it proceeds : " nor shall it be kept or deposited *in any place whatsoever*, except in such dwelling-house as above described, or in a church or place of worship, for sacramental purposes, or in a place where either some chemical, or mechanical, or medicinal art, requiring the use of liquor, is carried on as a regular branch of business; or while in actual transportation from one place to another, or stored in a warehouse, prior to reaching its place of destination." The last clause is not qualified by any provision as to the intent with which

the liquors are kept.   It is an absolute prohibition against their being kept anywhere but in the excepted places, although the owner may have no intention either to use, sell or give them away ; and the 4th section declares a violation of this clause to be a misdemeanor, and imposes a penalty of fifty dollars for the first offence.

Now what, under this law, is the condition of a person having spirituous liquors on hand on the day when the law takes effect ?   These liquors, or the rights of the owner in them, are property, and as such entitled to the protection of the constitution.   What, then, is the owner to do ?   If he does *nothing*, he is guilty of a misdemeanor ; because it is a violation of the act to *keep* the liquors *anywhere*, out of the excepted places, without reference to the intent of the owner.   Unless, therefore, he obtains the right to sell, or deposits the liquor in one of the excepted places, he must *destroy* it, or be liable to indictment and punishment as a criminal.   The act reduces him to this alternative ; it does not permit him to dispose of his liquors even to those authorized to sell.   In this respect it is inconsistent with itself.   It admits the value of such liquors for certain purposes, and yet prohibits their sale for those very purposes.

If it be conceded that the legislature has not the power to pass a law directing a *sheriff* or other officer *to destroy* these liquors, wherever he can find them, without any process whatever, then the constitutionality of the provision under consideration cannot, I think, be maintained ; because there can be no material difference between directing an officer to destroy them and directing the owner himself to do it, nor between enacting, in so many words, that the latter shall destroy them, and placing him in a situation which subjects him to conviction and punishment as a criminal unless he does it.   How is it possible *to deprive* a man more effectually of his property than to enact that he shall be deemed guilty of a misdemeanor, and be liable to a penalty, *if he keeps it for any* purpose?   This is precisely

3 KERN.—28

what the legislature has in substance done, since the only doors of escape left open to the owner are entirely illusory. They are, either to qualify himself, under sections 2 and 3, to sell, or to deposit his liquor in one of the excepted places. As to the first, he may not be able to obtain the necessary security, or to make oath that he does not use intoxicating liquor as a beverage. The law does not make such use a crime, nor does the constitution withdraw its protection in consequence of it. Such a man, then, although disposed to submit to the law, and not to sell for any unauthorized purpose, cannot save his property, even for those purposes which the law itself sanctions.

It may be said that he may remove the liquors to one of the excepted places. This might be done in some instances, and in small quantities. Some men own dwelling-houses, and some do not. Some might have access to mechanical or manufacturing establishments, and some would not. But the legislature has no power to compel the destruction of even the smallest quantity of liquor without a previous judicial condemnation. The idea of depositing all the liquor on hand, when the law took effect, in those excepted places, is plainly illusory. The suggestion that the owners might save their property by exportation is equally so. Admitting the right of the legislature to compel any class of citizens to remove their property out of the state, we cannot know, judicially, that an article, the sale of which is prohibited, and which is declared a nuisance in our own state, would be admitted as an article of merchandise into any other.

While, therefore, I do not question the constitutionality of the general objects of the prohibitory law, and fully concede the power of the legislature to prohibit the sale of intoxicating liquors, for all except mechanical, chemical and medicinal purposes, I cannot admit that it has the right to compel their *immediate and unconditional destruction,* as is, I think substantially done by this law. The guaranties of

the rights of property which the constitution affords, as my investigations in this case have satisfied me, are slender at the best, and I am unwilling so to interpret as entirely to nullify them.

There is one other argument, in connection with this branch of the case, which I will notice here.    It is said that the legislature has the conceded power to authorize the destruction of private property, in certain cases, for the protection of great public interests; as, for instance, the blowing up of buildings during fires and the destroying of infected articles in times of pestilence, and that the legislature is necessarily the sole judge of the public exigency which may call for the exercise of this power.    The answer is, that the legislature does not in these cases authorize the destruction of property; it simply regulates that inherent and inalienable right which exists in every individual to protect his life and his property from immediate destruction. This is a right which individuals do not surrender when they enter into the social state, and which cannot be taken from them.    The acts of the legislature in such cases do not confer any right of destruction which would not exist independent of them, but they aim to introduce some method into the exercise of the right. ( *See the able opinion of Senator Sherman, in Russell* v. *Mayor of New-York,* 2 *Den.,* 461.)    It has never yet been judicially decided in this state, so far as I am aware, that the officers upon whom statutes of this kind purport to confer power to destroy buildings, to prevent the spread of fires, would be justified in exercising the power in a case where it could not be properly exercised independent of the statute; and it may well be doubted whether the legislature can add to the extent or force of the natural right.

Again, the enactment of quarantine laws, by force of which not only is property destroyed but personal liberty restrained, is the exertion, by the body politic, of the same power of self-preservation which is possessed by individuals.

Their justification rests upon the immediate and imminent danger to life and health, which they are enacted to avert. If we admit the truth and force of all the reasoning upon which the statute before us is based, it will still be impossible to bring it within the range of this power. As well might an individual argue that, because he has a right to protect his life or property from immediate destruction, he has therefore a right to resort to any measure he may deem necessary to guard against remote and contingent dangers. It is clear, therefore, that no argument drawn from these and kindred enactments can be of any weight in determining the question here.

The conclusion to which I am thus brought is necessarily subversive of the first four sections of the law in their present form. For although, when only part of an act is unconstitutional, and that part is entirely separable from the remaining portion, the court will limit its condemnation to the part which conflicts with the constitution, yet this cannot be done where, as in this case, in a single section several acts in relation to the same subject matter, and connected in one sentence, are forbidden, and in another section all these acts are indiscriminately declared to be crimes, and one common penalty is annexed to each. The same provision cannot be both valid and void, as would be the case if it should be held that the penalties imposed by § 4 could be enforced as to part of the acts prohibited in § 1 and not as to others.

It may be said that although the legislature has not the power to annihilate existing rights of property in any article, it may nevertheless make it unlawful to acquire such rights in future; and may therefore enact that all rights of property in a particular article, thereafter acquired, shall be null, and that the article itself shall be destroyed; and hence that the present law may be enforced as to all rights not shown to have existed when the law took effect.

But conceding the power of the legislature to make such a law, it cannot support the present act, which operates indiscriminately upon all rights of property in the article in question, without regard to the time when they were acquired.    To hold the law valid and operative as to property acquired after it took effect, and void as to rights previously existing, would tend to the constant recurrence of the question before the courts as to its constitutionality, and to repeated judgments of condemnation of the law.

There are serious objections to this on grounds of public policy, which requires that collisions between the different departments of government should be as few and as brief as possible.    If the law was so framed, that proof on the part of the defendant that his rights of property involved in the case had existed before the act took effect, could be construed into a defence under the act itself, this objection would be removed.    But it is clearly otherwise.    Such proof would have no tendency to exempt the defendant or his property from the penalties of the law, except by calling upon the court to pronounce it unconstitutional.    Thus the courts would be required over and over again to declare the same legislative provisions both valid and void, as applicable to different classes of cases.    This has been in some instances, but with doubtful propriety, tolerated in purely civil cases ; but never, I believe. in respect to penal and criminal legislation.    It is not only liable to the objection already suggested. of calling into repeated action the ultimate judicial power of passing upon the validity of the acts of a co-ordinate branch of the government, but it would tend directly to encourage experimental legislation.    If the legislature may in a single provision encroach *ad libitum* upon the constitution, without other effect than to call upon the courts to limit its operation to cases within the purview of legislative power, nearly all motive for a careful regard for constitutional right in legislation would be removed and an onerous burden imposed upon the courts.    The general rule on this subject is, that

where part of a law is in conflict with the constitution, and that part is entirely separable from the residue, so that other portions of the law can be enforced without reference to it, there the unconstitutional part only will be condemned.   But where the legislative provision is indivisible, and the necessary discrimination has, as in this case, to be made at the trial, so that the rights invaded can only be protected by repeated judgments against the validity of the law, although there may be a class of cases to which it might properly apply, the provision is wholly void.   The law, therefore, must be revised and the proper discrimination made before it can be enforced.

I shall notice but a single additional point arising upon that portion of the law which is designed to enforce its penalties.   Section 17 contains important provisions which are made applicable to every prosecution under the act; and if the law is to be revised, it is undoubtedly desirable that the views of this court upon that section should be known.   The question arising upon it is, in my opinion, of greater importance than any other which the law presents, as it goes to test the value of those clauses of the constitution upon which our rights of personal security rest.   The second branch of the section provides that, upon the trial of any complaint under the act for an unlawful sale of liquor, the defendant shall not be permitted to justify, under the 2d section (the only way in which it is possible to justify), unless he shall : 1. Admit the sale, which, by the previous clause, is converted into *prima facie* evidence of guilt ; 2. Swear to his innocence, *i. e.*, his belief as to the use which the purchaser intended to make of the liquor ; and 3. State the reasons upon which his belief was founded.

Can this provision be reconciled with that clause in § 6, art. 1 of the constitution. which provides that "in any trial, in any court whatever, the party accused shall be allowed to appear and defend in person and with counsel," taken in connection with the provision in the same section,

that no person shall "be deprived of life, liberty or property, without due process of law?" Of what value is this right "to appear and defend," if the legislature can clog it with conditions and restrictions which substantially nullify the right? The constitution says, every man shall have a right " to defend." The legislature says, you may defend, provided you first admit yourself *prima facie* guilty Can these provisions be reconciled? In *Greene* v. *Brigg* (1 *Curtis R.*, 311), Curtis, J., speaking of the provisions of the constitution of Rhode Island, that no person shall " be deprived of life, liberty or property, unless, by the judgment of his peers or the law of the land," says : " The exposition of these words, as they stand in Magna Charta, as well as in the American constitutions, has been, that they require ' due process of law,' and in this is necessarily implied and included the right to answer and contest the charge, and the consequent right to be discharged from it unless it is proved." He subsequently adds : " It follows, that a law which should preclude the accused from answering to and contesting the charge, unless he should first give security in the sum of $200, with two sufficient sureties, to pay all fines and costs, and which should condem him to fine and forfeiture, unheard, if he failed to comply with this requisition, would deprive him of his liberty or property, not by the law of the land, but by an arbitrary and uncon-stitutional exertion of the legislative power." The conditions imposed upon the right of defence, by § 17 of our act, are far more onerous and embarrassing than that condemned by the learned justice in this passage; and if he is right, it is impossible to sustain the section against this objection. It is equally clear that it conflicts with another clause of the constitution. Section 6, art. 1 of the constitution, declares that no person " shall be compelled to be a witness against himself." Section 17 of this statute, says to the defendant, you shall not go into your defence, unless you will not only swear to your innocence,

but make yourself a witness to testify to all the circumstances of the case. This, for all substantial purposes, is compelling him to be a witness against himself. It is doing precisely that against which it was the object of the constitution to protect him, viz : searching his conscience under the constraint of an oath. There is no difference between compelling a man to be sworn, and assuming his guilt .f he refuses ; because his refusal has precisely the same effect as if he was sworn and testified to his own guilt; it convicts him. Indeed, the provision is virtually compulsory, as there could scarcely be a more effectual way of compelling a man to be sworn than to say, that unless you consent you shall be convicted and punished as a criminal. The section, therefore is, in this respect, in my judgment, a plain violation of the constitution.

But a point of still greater interest arises upon the first branch of § 17, which provides that, " upon the trial of any complaint commenced under any provision of this act, proof of the sale of liquor shall be sufficient to sustain an averment of an unlawful sale, and proof of delivery shall be *prima facie* evidence of sale." There are two classes of cases upon which this provision operates with great severity. Although the act does not prohibit the safe keeping of spirituous liquor or the giving it away in a private dwelling, yet by this clause the mere delivery is made *prima facie* evidence of an unlawful sale, without exception as to place. No one, therefore, can in his own house give a glass of wine to a friend, without thereby affording *prima facie* evidence to convict him of a misdemeanor. Other portions of the act purport to respect the sanctity of the private domicil of the citizen ; but its innermost recesses are penetrated by this provision, and acts of mere kindness or courtesy are converted into proofs of guilt.

But the operation of the section upon another class is equally onerous; I mean the class of licensed vendors. Sections 2 and 3 expressly authorize certain persons to sell,

who are required to give ample security not to violate any provision of the act, and yet, by force of the clause in question, every sale they make affords *prima facie* evidence to convict them. The act presumes against the innocence of its own selected agent, and will not permit this presumption to be rebutted until such agent consents to make himslf a witness in the case. This provision raises the vital question, as to the value of that clause in the constitution which secures to every man charged with crime a trial by "due process of law." The most important guarantees of individual right which our constitution affords are concentrated in this single phrase. As we have already seen, the expression, "due process of law," first appeared in a statute of Edward III. as a paraphrase of the words, "by the law of the land," *per legem terræ*, in Magna Charta ; and from that day to this both forms of expression have been held to refer to the common law, as distinguished from statutory enactment. Sir Matthew Hale says: "The common law is sometimes called, by way of eminence, *lex terræ*, as in the statute of Magna Charta (*chap.* 29), where certainly the common law is principally intended by those words, *aut per legem terræ*, as appears by the exposition thereof in several subsequent statutes, and particularly in the statute of 28 Edward III. (*ch.* 3), which is but an exposition and explanation of that statute." (1 *Hale's Hist. Com. Law*, 128.) Lord Coke also, in his commentary upon Magna Charta, puts the same construction upon the words. (2 *Ins.*, 45, 50.) The courts in this country have held the same. Chief Justice Ruffin, speaking of this clause in the constitution of North Carolina, in the case of *Hoke* v. *Henderson* (4 *Dev.*, 1), says that "such legislative acts as profess in themselves directly to punish persons, or to deprive the citizen of his property, without trial before the judicial tribunals, and a decision upon the matter of right, as determined by the laws under which it vested, according to the course, mode and usage of the common law, as derived from

our forefathers, are not effectually laws of the land for these purposes." To the same effect is the language of Judge Bronson, in *Taylor* v. *Porter* (4 *Hill*, 140), where, in speaking of § 1, art. 7, of the constitution of 1821, he says: "The meaning of the section, then, seems to be, that no member of the state shall be disfranchised, or deprived of any of his rights or privileges, unless the matter shall be adjudged against him, upon trial had according to the course of the common law."

If this interpretation is correct, and it is sustained as well by history as by judicial authority, the clause in question was intended to secure to every citizen the benefit of those rules of the common law by which judicial trials are regulated, and to place them beyond the reach of legislative subversion. They are, indeed, virtually incorporated into the constitution itself, and made thereby a part of the paramount law. Trials, therefore, at least such as are criminal, are to be regulated and conducted, in their essential features, not by statutes, but by common law. This the constitution guarantees. Precisely how far the legislature may go, in changing the modes and forms of judicial proceeding, I shall not attempt to define; but I have no hesitation in saying that they cannot subvert that fundamental rule of justice which holds that every man shall be presumed innocent until he is proved guilty. This rule will be found specifically incorporated into many of our state constitutions, and is one of those rules which, in our constitution, are compressed into the brief but significant phrase, " due process of law."

Can § 17 be reconciled with this rule? It provides that, upon every prosecution under the act, proof of a sale of liquor shall sustain an averment of an unlawful sale, and proof of delivery shall be *prima facie* evidence of a sale. It is plain that at common law the legal presumption would be directly the reverse of that declared by the act. Where the common law would presume innocence, this act pre-

sumes guilt. Either the guarantee of a judicial trial according to the course of the common law, is a nullity, or this provision is void. But I am prepared to go further, and to hold that all those fundamental rules of evidence which, in England and in this country, have been generally deemed essential to the due administration of justice, and which have been acted upon and enforced by every court of common law for centuries, are placed by the constitution beyond the reach of legislation. They are but the rules which reason applies to the investigation of truth, and are of course in their nature unchangeable. If it does not follow that to determine what they are, as applicable to judicial proceedings, is a judicial and not a legislative power, still they must necessarily be included in the phrase, "due process of law." If this be not the true interpretation of the constitution; if the legislature, in addition to declaring what acts and what intentions shall be criminal, can also dictate to courts and juries the evidence, and change the legal presumptions upon which they shall convict or acquit, there is no barrier to legislative despotism; and the separation of the legislative and judicial departments of the government, the guarantee of trial by jury, and of a trial according to the course of the common law, have all failed to afford any substantial security to individual rights.

I am unable, therefore, to resist the conviction that, in both branches of § 17, the legislature has transcended the just limits of its power, and trenched upon the constitutional province of the judiciary.

The judgment of the supreme court should be affirmed.

HUBBARD, J. The first ground assumed by the appellant's counsel on the argument was, that the sale of imported liquor in a less quantity than the package of importation was contrary to the provisions of the act under which the defendant was convicted. This is clearly a tenable position. In the view which I take of the law in

this case, it is not very essential that this proposition be considered at much length. But as the point has been fully argued, and presents a question of general interest as it respects the relative jurisdiction of the federal and state government over imported articles, including liquors, I will consider it in this place.

It is contended by the defendant's counsel that the exception contained in the 1st section of the act in question embraces all imported liquor in specie, irrespective of its condition, whether in the hands of the importer or third persons. The excepting clause reads as follows: " This section shall not apply to liquor, the right to sell which in this state is given by any law or treaty of the United States." In its general character the act is highly penal, and should be construed strictly. But this rule, intended for the protection of the liberty or property of the citizen, should not be so applied as to narrow the ordinary import of the words used, to the exclusion of cases, or description of property or persons, which, according to common acceptation, would be within them. ( 5 *Wheat.*, 76.) The office of all construction or interpretation of statutes, whether penal or remedial, in the application of its maxims, is to ascertain the mind or intention of the law makers. ( 1 *Seld.*, 562; 2 *id.*, 9.) Effect should be given, if possible, to every word used; and if doubt exists as to the real intention of the legislature, reference, to dispel the ambiguity, should be had to the body of the statute, its great object and policy. It is also a cardinal maxim of interpretation to so construe the words of a statute, if possible, as to uphold rather than defeat it; if susceptible of two hostile constructions, to give it that which will sustain and effectuate its object.

In the light of these maxims, it cannot be difficult to ascertain the design of the legislature in the exception referred to. The language or phraseology is not the most perspicuous, still the intention is quite apparent. The construction contended for by the defendant's counsel

would make the clause read as though it contained simply the words, " this section shall not apply to imported liquor." Had the legislature intended this broad exception, it is but reasonable to suppose they would have used this simple mode of expression, thus avoiding all speculation as to intention. The mode of expression adopted evinces clearly that a qualification was intended to be annexed. Considering the whole clause, in connection with the well settled right of the importer of liquor, I have no doubt the legislature designed to shield that right of sale, in the package of importation, which the importer impliedly has under the laws of congress, and to exempt the liquor in specie from the operation of the law only so far as necessary to protect that right. This construction harmonizes with the policy of the law, which was to cut off completely the traffic, within the state, in all liquor as a beverage, whether imported or not. It would be a futile measure, indeed, to proscribe the domestic and give entire immunity to imported liquor. Such an act would be *felo de se*, would defeat itself, and vastly increase rather than diminish the evils of intemperance. Such folly should not be imputed to the legislature.

In determining the scope of the exception, therefore, it is necessary to ascertain the nature and extent of the right of the importer to sell his importation. He has no right, grounded upon any express law or treaty; but it has been held that he has an implied right, growing out of his payment of duties, and that this right cannot be directly infringed or taken away by any state law. It was so adjudged in the case of *Brown* v. *The State of Maryland* (12 *Wheat.*, 419), and approved in the subsequent license case, in 5 *How.*, 504. These decisions, pronounced by the highest tribunal in the land, whose peculiar province it is to expound the federal constitution and laws, and to define the boundary between the federal and state sovereignties, establish that no state can pass a law for the purpose

of license, taxation or otherwise, directly affecting an import of foreign merchandise while in the hands of the importer, nor impair the right of sale in the original package of importation. A state law having this direct effect invades the domain of congress in its regulations of foreign commerce.

But it is urged that if the act in question assumes to prohibit the sale of imported liquors by retail, within the interior of the state, it conflicts with the revenue laws of congress. The argument is, that the prohibition lessens the value of the article, discourages importation, and thus, as a consequence, tends to diminish the *quantum* of revenue. This consequence is admitted, but the argument proves too much; legitimately carried out, it would forbid the state from enacting any laws, for taxation or otherwise, operating upon property imported of all descriptions, as the result must to some extent affect the quantity of imports. But aside from this, the question is perfectly answered by the decisions in the supreme court of the United States above cited. ( *Thurlow* v. *The State of Mass., Fletcher* v. *The State of Rhode Island, Pierce* v. *The State of New Hampshire,* 5 *How.,* 504.) Those cases arose under the license laws of the several states. The two first decide the precise question under consideration. They distinctly hold that the power of congress in regulating foreign commerce extends no further into the interior of a state than is essential to render the power effective in the collection of duties, that for this purpose it embraces the article imported while it remains in the hands of the importer, and until he exercises his implied right of sale ; that as soon as the article loses its distinctive character as an import, is broken up or sold, it then mingles with the general mass of property of the state and becomes a subject of state authority. Here is a well defined boundary between federal and state jurisdictions, as it respects all importations. The act in question, by the exception alluded to, expressly refrains from all

interference with the operation of the laws of congress or with the right of sale of the importer as above stated, and hence is not obnoxious to the objection I am considering.

The next question to be considered relates to the prohibitory character of the law, and its vindicatory provisions as it respects existing rights of property in liquor at the time the act took effect. This is purely a question of legislative power, under the fundamental law. It is needless to say that the courts have no concern with the wisdom or expediency of the enactment to accomplish the beneficent ends indicated by the title. The policy of this government, from its foundation, certainly vindicates the political necessity and economy of stringent laws circumscribing the sale of spirituous liquors. I entertain no doubt of the constitutional competency of the legislature to prohibit entirely the commerce, within the state, in liquor as a beverage, by laws prospective in their operation. If, in the judgment of the legislature, the public welfare required it, the future production, manufacture or acquisition of liquor might be prohibited. The sovereign power of the state in all matters pertaining to the public good, the health, good order and morals of the people, is omnipotent. Laws intended to promote the welfare of society are within legislative discretion, and cannot be the just subject of judicial animadversion, except when it is seen that the constitutional guarantees of private property have been invaded. The police power is, of necessity, despotic in its character, commensurate with the sovereignty of the state; and individual rights of property, beyond the express constitutional limits, must yield to its exercise. And in emergencies, it may be exercised to the destruction of property, without compensation to the owner, and even without the formality of a legal investigation. It is upon this principle that health and quarantine laws are established; that a building is blown up to arrest a conflagration in a populous town; that the public market is purged of infectious articles; that

merchandise on ship board, infested with pestilence, is cast into the deep, and public nuisances are abated. It is the public exigency which demands the summary destruction, upon the maxim that the safety of society is the paramount law. It is the application of the personal right or principle of self-preservation to the body politic. I know of no limits to the exercise of the police power vested in the legislature except the restrictions contained in the written constitution. Under our system of government, with co-ordinate branches, each independent within its sphere, and all deriving their powers from a common source, the fundamental law, one cannot exercise a supremacy over the other, except as it finds its warrant for it in that law. The judiciary possesses no legitimate authority over acts of the legislature, aside from the constitutional grant; and even this authority is exercised in an indirect manner, when its powers are appealed to, to carry a statutory law into effect; and then only as it respects the individual rights of property or person.

It is said that this idea of the omnipotency of the legislature, aside from the express constitutional restrictious, is a fallacy. It is conceded that all power emanates from the people, and that the written constitution clothes the legislature with all the power it possesses. But the grant of power in that instrument is general, of all the legislative power of the state; what this is precisely, is not and cannot well be defined. Aside from the express limitations, it is believed to embrace all the common law power which the legislature would have possessed had the fundamental law remained, as in England, a part of the unwritten law of the state. This is by no means an alarming proposition. The declaration of rights, forming the guarantee of personal liberty and property in the first article of the constitution, when construed according to its full spirit and intent, is quite ample to protect the citizen against the unauthorized encroachments of the legislature; to protect against all

sumptuary laws and laws of kindred character, which have not the public good for their object. I am opposed to the judiciary attempting to set bounds to legislative authority, or declaring a statute invalid upon any fanciful theory of higher law or first principles of natural right outside the constitution. If the courts may imply limitation, there is no bound to implication except judicial discretion, which must place the courts above the legislature and also the constitution itself. This is hostile to the theory of the government. The constitution is the only standard for the courts to determine the question of statutory validity.

There is no constitutional restriction upon the power of the legislature in the regulation of the sale or traffic in intoxicating drinks, whether affecting existing rights of property in liquor or not. As a scheme of regulation, the degree of the limitation of the sale or traffic is a matter of legislative discretion. The fault of the present law is, that it does not profess to be a scheme of regulation. There is no attempted discrimination between liquor owned at the time the law took effect and that acquired afterwards. I have reflected with much attention to see whether the courts could not make the discrimination, for instance, as a question of fact, to be ascertained in a given case, but I have encountered the insurmountable difficulty, that the legislature plainly intended that there should be no such distinction. No defence on a trial could be admitted on such ground, for the reason that it would be against the manifest policy of the act. It is the intent of the statute alone which the courts are authorized to execute.

The prohibitory feature of the law must, therefore, be regarded as extending to all liquor in the state at the time the act took effect. In this aspect I will, in a few words, give my views of its unconstitutionality as it respects vested rights of property in liquor, under the organic law, which forbids the citizen being deprived of his property without due process of law. That liquor is recognized by the law

3 KERN.—29

as property, that the constitution knows no distinction in its guarantees of the rights of property of all kinds, that the constitutionality of the law is to be tested the same as though it related to some other and perhaps better species of property, is not questioned.   The constitution surrounds liquor, as property, with the same inviolability as any other species of property.   There can be no room, I think, for difference of opinion as to the meaning of the phrase, " due process of law," as used in the constitution.   It means an ordinary judicial proceeding.   In a criminal case, an arraignment, formal complaint, confronting of witnesses, a trial, and regular conviction and judgment.   When a forfeiture of property is made a part of the punishment, as in this case, the judgment embracing it would, in its effect, deprive the offender of his property in the constitutional method. I think it competent for the legislature, to declare a forfeiture of liquor, which an offender may have in possession, as a mode of punishment; and if the law in question was in other respects constitutional, I should uphold the judgment of forfeiture in this case as entirely proper.   But the portion of the law which authorizes the seizure and destruction of liquor, where the prosecution or conviction of the owner is not contemplated, I should not hesitate to pronounce void, as property is thus destroyed or the citizen deprived of it without process of law.   It is not pretended, nor can it be, that property which is not *per se* a nuisance can be annihilated by force of a statute alone, or by proceeding *in rem* for the punishment of a personal offence.   Liquor is not a nuisance *per se*, nor can it be made so by a simple legislative declaration.   It does not stand in the category of common nuisances which of themselves endanger the welfare or safety of society.   It is its use and abuse as a beverage which gives it its offensive character.   Otherwise it is entirely inoffensive.   In my judgment, therefore, it cannot be confiscated to prevent its misuse, except through a prosecution against the owner *in personam.*

But it is said that this law does not assume to deprive any one of his property in liquor ; that the owner is allowed to retain the unmolested custody and personal use of it, according to his pleasure. It is true that the owner may not be molested in this enjoyment, provided he keeps it in his dwelling-house, if fortunate enough to possess a domicil. I apprehend that by a fair construction of the law he is forbidden, under a severe penalty, from keeping it elsewhere, except for mechanical and other specified uses, although innocent of any intent to sell. I have examined the 1st section of the law with care, to see if it could not be construed in such manner as to make the keeping in any place, except a dwelling-house, criminal only when accompanied with an intent to sell. But the section cannot be so construed. The language is too clear to admit of a doubt as to the intention of the legislature. The keeping or deposit in any place, except in a dwelling-house, or place where some trade or business is carried on requiring its use, is prohibited, and by the 4th section of the act such keeping or deposit is a crime. This, certainly, is a most extraordinary provision, which must have the effect to render a person a criminal who was so unfortunate as to have a quantity of liquor on hand in a forbidden place at the time the law took effect, although he had no intent to violate the law by selling. A person thus circumstanced would have but one of two alternatives to avoid criminality, either just before the law took effect to remove the liquor to a dwelling-house, or to a shop for mechanical and other prescribed uses, or destroy it with his own hand. I can scarcely credit that the legislature designed the law to have this effect ; but no other construction can be put upon the language of the 1st section of the law, and we are bound to suppose, judicially, that the legislature intended what their words import

The law does not even countenance the exportation of the liquor after it took effect. The plain design of the law

seems to have been to cut off the liquor itself, to insure its destruction, by circumscribing the keeping of it, and authorizing its seizure, if kept in a forbidden place or with a criminal intent to sell. The entire right of sale, within the state at least, is prohibited, and in this, in my judgment, consists the error of the law as it respects liquor owned when the law went into operation. If there had been any right of sale within the state preserved, for instance, to a licensed vendor, although of minor importance, it would have been sufficient, perhaps, to have impressed the law with a character of regulation, and saved its validity.

But the abolition of all right of sale in the state is equivalent to and is a substantial deprivation of the owner of his property. The right of sale is of the very essense of property in any article of merchandise; it is its chief characteristic; take away its vendible quality and the article is practically destroyed. As applied to merchandise of any description, this effect can be judicially seen. Even if the law allowed exportation, that would be of such minor importance as not to save the law from the charge of effectually depriving the owner of his property in the liquor. It is but of trifling value after the entire domestic market is closed against it.

I am unable, therefore, to avoid the conclusion that the prohibition in the 1st section of the law is invalid, inasmuch as it makes no discrimination, nor allows the courts to make any, but extends to all liquor, irrespective of the time of its acquisition; and that, by closing the domestic or state market, it in effect substantially deprives the owner of liquor acquired before the law took effect, of his vested right of property therein, without due process of law.

At the trial before the police justice, the defendant offered bail for his appearance before a higher court having criminal jurisdiction. It was an error for the court to refuse to receive it. I am well satisfied that the defendant had a constitutional right to be tried by a common law jury of

twelve men, and that to this end he should have been allowed to give bail to appear before a tribunal where such a jury could be obtained. This right of trial by jury is secured by art. 1, § 2 of the constitution, which reads: "The trial by jury in all cases in which it has been heretofore used, shall remain inviolate forever." The term cases is used in a generic sense; it embraces grades or classes, not individual or particular cases, except as they make up a class. The intent of the constitution was to preserve the right as amply as it was enjoyed at the time of its adoption. The right of bail existed in all cases of felonies and misdemeanors, and was intended to be preserved without any distinction as to whether the offence existed at the time the constitution took effect or was subsequently created by statute. There is no ground for any such distinction in principle, as the right is as important in the one case as the other, as the punishment may be the same. Section 6 of the same article of the constitution does not assume to limit the operation of § 2. That section simply forbids the legislature from enacting any law by which an offender, charged with an infamous crime, in other words a felony, may be held to answer, except upon indictment. By implication, it is said the legislature may prescribe the mode of trial in all cases of misdemeanors. No such implication should be indulged to take away an express grant of the great privilege of trial by a common law jury, secured by another section. It may be that, under this implication, the legislature may provide for the trial of a misdemeanor before a court of special sessions, with or without a jury, subject, nevertheless, to the right of the accused to give bail to secure the advantages of a jury at common law. In this view the two sections are harmonious, and do not in any respect conflict.

It may be said, perhaps, that the right of such a jury trial in misdemeanors was not an absolute right under the law as existing when the constitution was adopted; that it was conditioned upon giving bail within twenty-four hours

after arraignment.   This condition, however, does not affect the right itself; it is the misfortune of the accused, if his poverty prevents him, from availing himself of the condition.   The right is perfect, and the constitution secures its exercise upon the condition, which right cannot be taken away by any legislative act.

I am of the opinion, therefore, that the judgment of the supreme court ought to be affirmed.

MITCHELL, J.   " The trial by jury, in all cases in which it has been heretofore used, shall remain inviolate forever." ( *Const. of* 1846, *art.* 1, § 2.)

This means the common law jury of twelve men.   It had been usual from 1824 to 1846 to allow a defendant on a trial, even for misdemeanors, to elect whether he would be tried by such a jury or not, provided he gave bail within twenty-four hours after being required by the magistrate to do so.   If he omitted to give bail, he was to be tried by the justices at special sessions, but then by a jury of six men.

Toynbee was brought before the justice on the 17th of July, and on the same day objected to be tried by the special sessions, and offered to give bail to appear at the next court having criminal jurisdiction.   This the justice refused.   He thus refused him a right of trial by a common law jury in a case in which it had been used before 1846. That was contrary to the constitution.

At the general term, in another district, it was held that this provision in the constitution was copied from the constitution of 1778 and of 1821, and that the word " heretofore" means the same as in those constitutions, on the principle that revised laws although changed in their phraseology are not generally held to be changed in their meaning, and that before 1824 trial by jury did not exist as a right in such cases.   This mode of interpreting a constitution should not be adopted, when not in favor of but against liberty, and when the terms used naturally have a

different meaning, and there was a sufficient reason for the use of that different meaning.

The judgment in favor of the defendant should be affirmed.

DENIO, C. J.   In these cases I have arrived at the following conclusions:

(1.) That the several provisions of the act under consideration do in effect annihilate and destroy the rights of property which the citizens of this state possessed, at the time it took effect, in intoxicating liquors.   This, in my opinion, cannot be done consistently with the provision in the constitution which declares that no person shall be deprived of life, liberty or property, without due process of law.

(2.) Although it is, in my opinion, competent for the legislature to pass an act containing the provisions embraced in this statute, to operate only upon intoxicating liquors hereafter to be imported or manufactured, the act referred to does not discriminate between existing property and that which may hereafter be acquired or created, but operates equally upon all such property without any respect to the distinction referred to.   It does not recognize any defence based upon that distinction, and the courts cannot entertain any such defence without holding the statute in question unconstitutional in its most material and practical operation. I am, therefore, of opinion that the act cannot be sustained in regard to existing or future property.

(3.) The fair and I think the necessary construction of that part of the act which subjects an alleged offender to trial before a court of special sessions, deprives him of the right of trial by jury.   The act does not allow such accused person to give bail and thus transfer the case to the general sessions.   The offences are of the class which must have been punished by means of a jury trial at the time the constitution was adopted.   In cases where a jury trial had

been theretofore used, it is declared by the constitution that it shall remain inviolate forever.

I am, therefore, in favor of pronouncing a judgment of reversal in the first mentioned case, and of affirmance in the other.

T. A. JOHNSON, J. (Dissenting.) The plaintiff in error was indicted by a grand jury of Erie county, charged with having sold intoxicating liquor in small quantities, contrary to the provisions of the prohibitory act of April 9th, 1855, and was tried and convicted of the offence at a court of sessions. It was proved upon the trial that he had on several occasions, between the 4th of July of that year and the time of the indictment, sold and delivered, at his bar in Buffalo, to various persons, brandy, in quantities less than one pint, which was drank upon his premises. As the plaintiff in error had no license to sell in that manner and for that purpose, the acts proved were such as have been misdemeanors in this state, by statute, subjecting the offender to indictment and conviction, in the manner adopted in this case, certainly ever since the excise act of 1801 up to the time when the act in question took effect It is to be seen, therefore, whether such acts are still criminal in their character, or whether, under the present statute, the criminal feature, so long and uniformly stamped upon them hitherto, has been taken away.

The indictment is for selling contrary to the provisions of this act, and not to the provisions of the Revised Statutes; and unless this act has been violated, the conviction in any view is erroneous.

Only two questions properly arise in this case. 1st. Was the liquor so sold by the plaintiff in error subject to the prohibition in the 1st section of the act? and 2d. Has the legislature power to enact a valid law, to prohibit the traffic in intoxicating liquors, to the extent to which prohibition is sought to be carried by the act in question?

The ground upon which it is claimed that the liquor in question, and consequently the act of selling, was exempt from the operation of the act, is, that it was liquor which was imported from a foreign country, in pursuance of the laws and treaties of the United States, and the duty regularly paid upon it by the importer; that the plaintiff in error purchased it from the importer, in the original package, and drew it from such package when it was sold as complained of. These facts, which the plaintiff in error offered to prove on the trial, were admitted on the part of the public prosecutor; but the evidence was objected to on the ground that it was irrelevant and immaterial, and the evidence and the consideration of the facts conceded were excluded by the court on that ground. Under these circumstances, was this liquor subject to the prohibition in the act, at the time of the sales in question, or was it exempt? The last clause of the 1st section is as follows: "This section shall not apply to liquor, the right to sell which, in this state, is given by any law or treaty of the United States."

Doubtless, the 1st section did not apply to that liquor while in the hands of the importer and before he had sold it, assuming the facts as they were admitted to exist. But did the exemption, which thus far attached, follow it into the hands of the plaintiff in error, so as to authorize sales by him? Is that the meaning of the provision? This must depend, I think, upon the question whether the laws or treaties of the United States follow property imported from foreign countries, after it has passed from the hands of the importer to citizens of this state, and confer any rights or privileges upon it which do not attach to other property in this state, not imported. If they do not, the terms of the exception do not apply; the right to sell at the time and in the manner was not given by any law or treaty of the United States. That these laws and treaties do not thus follow property, after it has passed from the hands of the

importer and become part of the mass of property in the state, is conclusively· established. (*Brown* v. *The State of Maryland*, 12 *Wheat.*, 419 ; 5 *How.*, 504.)

The obvious design of the provision was not to confer any privilege or give any exclusive right to foreign over domestic liquor, but simply to avoid all collision between state and federal authority. The exemption continues while the right continues. But where the article has passed from under federal jurisdiction, and no right from that source is any longer given, the exemption ceases. The right must be given at the time of the sale, or the liquor sold is not exempt. This is, I think, the plain reading of the clause, and that such was the intention of the legislature no one can reasonably doubt. If we could ignore the whole scope and spirit of the act, and exclude from view its design, as declared upon its face, and look only to the wording of the clause, we might give the construction to it contended for by the learned counsel for the plaintiff in error. But this would violate all rules for the interpretation of statutes. If the language is susceptible of interpretation in harmony with the declared object of an enactment, courts are bound to give it that interpretation. They can only give a construction which will convict the legislature of absurdity or folly, in cases where the language employed is so clear as to leave no alternative.

Without stopping, therefore, to inquire whether there is any existing law or treaty which had, at some time and under other circumstances, given another person the right to sell the liquor in question, it is clear that neither could have conferred any right upon the plaintiff to make the sales of which he was convicted, and the exception does not help him.

The question then arises, whether the legislature has power to make a valid law prohibiting the sale of property of this description, for the purposes for which it had been before most commonly purchased. It is a question of

power simply, and leads to an inquiry, first, into the nature and extent of the law-making power in a state government within the United States.

Each state is undoubtedly a complete and perfect sovereignty in itself, in all cases and in respect to all matters in which powers naturally pertaining to states as sovereignties have not, by express grant or by necessary implication, been conferred upon the general government. In respect to the powers conferred upon the general government by the constitution of the United States, the states are subordinate powers, and can enact no valid laws in conflict with that constitution, or with laws constitutionally enacted by congress, or treaties made under the proper authority.

The position is assumed by the learned counsel for the plaintiff in error, that any law of a state limiting and restricting or prohibiting sales of imported property, by the immediate or remote purchaser from the importer, inasmuch as it might and naturally would tend to discourage and prevent importation, is in derogation of the authority of the general government under which importations are authorized, and therefore void. But the conflict of authority between the two jurisdictions has never been carried to this extent, and the law in this respect is decisively settled the other way in the case above cited. Chief Justice Taney, in his opinion in the license cases, says : " These state laws act altogether upon the retail or domestic traffic within their respective borders. They act upon the article after it has passed the line of foreign commerce, and become part of the general mass of property in the state. These laws may, indeed, discourage imports and diminish the price which ardent spirits would otherwise bring. But although a state is bound to receive, and to permit the sale by the importer, of any article of merchandise which congress authorizes to be imported, it is not bound to furnish a market for it, nor to abstain from the passage of any law

which it may deem necessary or advisable to guard the
health or morals of its citizens, although such law may
discourage importation or diminish the profits of the impor-
ter, or lessen the revenue of the general government    And
if any state deems the retail and internal traffic in ardent
spirits injurious to its citizens, and calculated to produce
idleness, vice or debauchery, I see nothing in the constitu-
tion of the United States to prevent it from regulating and
restraining the traffic, or from prohibiting it altogether, if
it thinks proper." The doctrine contended for, if well
founded, would deprive the state of all power to regulate
the use or transfer of such property, or to tax it, and tend
to the subversion of all state government.

It is claimed, also, that the act in question impairs the
obligation of contracts, and is, therefore, in conflict with
the constitution of the United States.

It is difficult to see, however, how this act impairs the
obligation of any contract which was in force when the act
took effect, or what possible bearing it can have upon such
contracts.   The case must undoubtedly rest upon the ques-
tion of legislative power, under the state constitution, irre-
spective of all questions of federal authority.   The power
to make general laws is necessarily and inherently sove-
reign power.   The first idea of a law, obliging to acts, or
forbearance of acts, involves the idea of sovereignty as to
its origin.   With us, this power is lodged by the constitu-
tion with the senate and assembly, and it exists in those
bodies as fully as it did or could exist in the sovereign
people by whom the constitution was made, except in those
cases where its exercise is limited and restricted by some
express or clearly implied limitation in the instrument itself.
Where the power is limited, it can only be exercised subject
to and in accordance with the limitation.   In those cases it is
a limited sovereignty.   But where the constitution imposes
no restriction, and the power sought to be exercised is not

possessed by the general government, it exists without restriction. The only limitation, then, for aught I can see, is the discretion of those who possess and are appointed to use it, within the boundaries of human action or capacity. And whether the constitution is to be regarded as a grant of the power, or the mere recognition and acknowledgment of its existence as inherent in those bodies, the result is the same. For, if a grant, it is plenary, and carries the entire legislative power, the power to make laws for the government of the state, to be enforced upon those who granted it. However derived, it is a superior power, sovereign in its nature, and the rules which apply to mere delegated and secondary powers do not apply to it. Clothed with this power, the corresponding duty necessarily devolves upon the legislature of determining what acts are compatible with the safety and welfare of all classes of citizens and what not, and what acts are so far prejudicial and injurious as to become criminal. Such acts it may declare criminal, and forbid and fix the grade of the crime, and the appropriate measure of punishment. Some criminal acts it punishes with the forfeiture of life, some with that of liberty and all civil and political rights, others with the forfeiture of property and the infliction of penalties only. It authorizes the real and personal property of one person, without his consent and against his will, to be alienated and transferred to another, in satisfaction of obligations unperformed and promises broken. It levies contributions in the form of taxes upon every man's property, for the support of government, and to make improvements conducive to the general convenience and prosperity. All this is but the common, ordinary exercise of legislative power. One of its first and clearest duties is to make all necessary laws, to remedy existing and admitted evils, and to prevent their recurrence. And of this character and for this object is the statute in question.

That intemperance, pauperism and crime are evils, with which the government is necessarily compelled to deal, none will deny. In the judgment of the legislative bodies, by which this statute was enacted, one great source of all these great, oppressive and dangerous evils was the traffic in intoxicating liquors. So injurious, in their opinion, has this traffic become under existing restrictions, in its consequences upon the community, that it ought to be subjected to still more rigorous and extensive restrictions and prohibitions, and impressed with additional features of criminality. If the legislature had the power to enact a law to accomplish this end, the right to choose the means best calculated to effect it was necessarily vested in it; unless, indeed, the use of such means is forbidden by the constitution. And this is the point apparently most relied upon by the learned counsel for the plaintiff in error. The position is, that no traffic in any article which the law regards as property, however injurious it may be, can be subjected by law to such regulations and restrictions as in a great measure to destroy it, without coming in conflict with that provision of § 6, art. 1 of the constitution, which declares that " no person shall be deprived of life, liberty or property, without due process of law." The argument is, that the value of property as an article of trade is an essential element of it as property, and that to the extent to which the restriction or prohibition diminishes its value for such purposes, to the same extent the owner is deprived of his property, although neither the title nor the possession of such owner is in any respect interfered with; and that this is accomplished by the operation of the act, independent of any trial or judgment, in other words, without due process of law. Is not this a strained and unwarrantable construction and application of this provision of the constitution? Clearly it is. This provision has no application whatever to a case where the market value of property is incidentally diminished by the operation of a statute passed

for an entirely different object, and a purpose in itself legitimate, and which in no respect affects the title, possession, personal use or enjoyment of the owner. Such a construction would prohibit all regulations by the legislature, and all restrictions upon the internal trade and commerce of the state; it would place the right of traffic above every other right, and render it independent of the power of the government. "Deprived" is there used in its ordinary and popular sense, and relates simply to divesting of, forfeiting, alienating, taking away property. It applies to property in the same sense that it does to life and liberty, and no other. Prohibiting the sale of property, except under and in pursuance of a license, and for certain specified purposes, is in no sense depriving a person of it. The prohibition tends to hinder and prevent divesture, but in no respect to enforce it. When a person is deprived of his property "by due process of law," the thing itself, as we all know, with the legal title is taken away. All his rights in respect to it are entirely extinguished, and transferred with the *corpus* to another. The very language and subject, therefore, of the limitation upon the power, or the condition upon which its exercise is permitted, explain and define exactly the nature and character of the deprivation intended. The legal rights incident to every species of property, in the absence of any specific regulation, are numerous; and can it with any reason be said that the mere abridgment, or, indeed, the entire extinction of some of these rights, deprives the owner of his property, in the sense of the constitution, especially where the article or thing itself and the legal title remain as before?

The act does, indeed, by other provisions, directly provide for depriving the owner of his property by forfeiture and destruction; but that is where it is kept for an unlawful purpose, and after a trial and judgment. That provision has no bearing upon the question under consideration. When the property is taken from the owner and destroyed,

he is then deprived of it by virtue of the act, not before. It might be urged, with precisely the same pertinency and force, that a statute which prohibits certain vicious actions, and declares them criminal, deprives persons of their liberty, and is therefore in derogation of the constitution. The constitutional provision referred to was intended to protect property from confiscation by legislative enactments, and from seizure, forfeiture and destruction, without a trial and conviction by the ordinary modes of judicial proceeding. There is no pretence that the plaintiff in error in this case was not convicted by due course and process of law.

There can be no doubt that intoxicating liquor is property. It is a chattel, an article of use, of consumption and of commerce, and is property in the strictest legal and constitutional sense. But in order to show that the act, by its own inherent force, and independent of the authority it confers upon the magistrates or the courts, deprives the owner of his property, it is necessary to insist, and we are asked to determine, that the legal property is not the article itself, but consists in some of its qualities or incidents. It is urged that the legal property is principally in its vendible quality, and consists mainly in its commercial value, in the money the owners might receive in exchange for it in the market; and that in this sense the owner is deprived of it whenever legislation tends to lessen its current market value.

The inquiry, whether the chattel in its corporeal substance and entity is property, or whether the legal property does not consist in some incident or right which the law confers or attaches, is one more appropriate to the schools than the courts. Constitutions and general laws are not founded in any such subtleties, and can never be safely interpreted by them. If we permit ourselves to depart from the obvious, general fact, that the thing is property, and enter this field of speculation into which we are thus invited, we shall be in great danger of losing our way

in its uncertain paths, and involving ourselves in the grave absurdity of holding that a statute which forbids a person selling an article of use and consumption, and renders it necessary for him to keep it for his own use and consump tion, instead of selling it to others to be used or consumed by them, really takes it away from him, and deprives him of it contrary to the constitution.   It will be found impossible for this court, extensive and final as its authority is, to make a proposition true in law which is so essentially and palpably untrue in fact.

But should we adopt the fallacy that the exchangeable value of the chattel is the legal property, and that this is what the constitution was designed to protect, how would that affect the statute in this case?   There is nothing in the terms of the act on the subject of value or price; and the fact, if it be one, that its operation has been to reduce the price or market value of liquors, is the subject of evidence, and must be established by proof.   There is not a word of proof upon the subject in the case, one way or the other.   It is not a fact of which we can take judicial notice; for the courts, without evidence, cannot see whether the tendency of the act has been or will be to enhance or to diminish the value of the stocks on hand when the act took effect.   Certainly it is no truism, either in law or in political economy, that a restriction upon the sale of an article diminishes its exchangeable value under all circumstances.   If it may be still sold for some purposes, the result may well be to enhance the value.   That would depend in a great degree upon the future supply.   But for this court to assume the fact that the act has had or that it will have the effect to reduce or destroy the market prices or value of the article as the basis of its action, without any evidence whatever to support it, and proceed to declare the statute void on that ground, would be a proceeding without precedent or parallel in judicial history.   It would be a mere arbitrary judicial repeal of the statute, instead of a

3 KERN.—30

judgment founded on ascertained facts and the law of the land.

Even were we to go to the extraordinary and unprece dented length of holding that the government is bound to provide a market or at least leave some market open for every noxious or deleterious article which may enter into commerce, and in which the owner has property by law, this duty has been performed, in respect to liquors, by the act in question. Every citizen is expressly authorized to apply for and obtain a license to sell his own liquors, for the uses and purposes permitted by the act, by complying with the conditions. And these conditions are scarcely more stringent than those imposed by the former excise laws; and besides this, the right to export remains untouched. It cannot, therefore, as it seems to me, with entire candor and fairness be contended that any single element of property has been destroyed by the act alone.

But in my judgment the constitution has no such meaning, and is neither in its language or spirit susceptible of any such interpretation. It looked only to the title and possession of the substance, and was never intended to place a restraint upon legislative power so entirely fatal to its usefulness and authority as the construction contended for would establish. Courts ought not certainly to extend the provisions of the constitution, by a strained construction, for the purpose of shielding and fostering a traffic which, in the judgment of the legislature, is productive of such serious evils. The same argument would, if sound, prove all our former excise laws unconstitutional. Those laws, it is true, were confined to the retail traffic, in quantities less than five gallons. But that was the traffic from which the great majority of the consumers of the article always were and always will be supplied while it exists. Every restriction upon that branch of the traffic was calculated, therefore, to affect the interests of by far the greatest num- ber of individuals. And yet, so far has the principle of

restriction and prohibition, in this department of the trade, been uniformly carried heretofore, that probably not one in five hundred of the entire population of the state has ever had the right to sell a glass of spirituous liquor, or any other quantity below five gallons, to any person or for any purpose whatever.

The exercise of what is now claimed as an absolute, inalienable right to sell whatever is property, by any one not specially authorized, has thus far, as respects this traffic, been declared and held to be a crime. Over this branch of the traffic the government has hitherto assumed and exercised entire and exclusive authority and control. No one could engage in it at all, without a special license acknowledging the government as the source of the right. All others were rigidly excluded, and natural right, if such there be more than in name in regard to mere traffic in property between individuals in a civilized and organized society, entirely extinguished. No person was entitled to a license without possessing certain prescribed moral and other qualifications, to be certified on the face of the license. The permission, when granted, only conferred limited and partial rights and privileges, which could not be exceeded by the holder without the forfeiture of his privilege and amenability to punishment for crime. A grocer, under his license, could only sell to persons to carry away. He could not sell liquor and allow it to be drank upon his premises. The tavern keeper, on the contrary, under his license, could not sell to a person to carry away. He could only sell to be drank in his house or upon his premises. Very few persons could ever engage in one branch of this traffic, that of selling to be drank at the time of sale. To enable a person to obtain this species of license, he must propose to keep a tavern; the commissioners must be satisfied that he was of good moral character, and was of sufficient ability to keep an inn or tavern; that he had the necessary accommodations to entertain travelers, and that a tavern was abso-

lutely necessary for the actual accommodation of travelers at the place where it was to be kept. In addition to all this, he was required to give a bond to keep an orderly house, and not to suffer certain practices in it. If he trusted any one for liquor more than the sum of $1.25, unless he was actually a lodger in his house or a traveler not residing in the same city or town, he could not recover it by action. All securities taken for it were void, and he was liable to forfeit double the amount thus attempted to be secured. All persons (those having a license as well as others) were absolutely prohibited from selling or giving away any quantity to an Indian, in this state, or to a person designated and described by the overseer of the poor of a town as an habitual drunkard, after notice served by such overseer, or to any clerk, agent or member of the family of the person thus designated. In short, it will be seen that in nothing has the power of the government been more uniformly and steadily exercised, from the beginning, than in hedging about, and placing guards, restrictions and prohibitions upon the traffic in intoxicating liquors, to the exclusion of all mere natural rights, and that, too, for the purpose of preventing, as far as practicable, the very evils sought to be prevented by the act in question. Congress has uniformly exercised the same power in reference to the traffic in the territories of the United States.

It was admitted fully on the argument by the learned counsel for the defendant, that the legislature might restrict and control the traffic to the extent to which it had exercised the power before this act, and that all former acts on this subject were valid constitutional acts. This concession, which might well be made in respect to the exercise of a power and the pursuit of a policy by the legislature under every constitution from the origin of the government to the present, and which was practiced under the colonial government for at least half a century before the revolution, seems to me to cover the whole ground of the controversy,

It will be seen from the above brief summary that the power heretofore exercised was identical in kind with that exercised in passing this act, and differs only in degree. The principle and policy upon which the former legislation was founded has been extended. Nothing more. The constitution certainly creates no distinction, in regard to the exercise of legislative powers, between the different branches of traffic; and who shall say that the whole of any traffic is more exempt from legislative supervision and control than a part? If in the retail traffic the legislature may constitutionally say who may sell and who may not, and for what objects and purposes, and to what class of persons sales may and may not be lawfully made, why not in the wholesale? There is no difference in principle.

"Questions of power," says Chief Justice Marshall, in *Brown* v. *The State of Maryland* (*supra*), "do not depend upon the degree to which it may be exercised. If it may be exercised at all, it must be exercised at the will of those in whose hands it is placed." The principle which will authorize the prohibition of the sale of four gallons, or any quantity less than five, in a single bargain, will authorize the prohibition of the sale of less than a hundred gallons, or a thousand, at one time, and, indeed, any sale whatever. The extent is a question of policy and expediency, not of principle. It becomes a question, not of the existence of the power, or the right to exercise it, but of the degree to which the public interests require its exercise; and this is necessarily a matter of legislative discretion, with which courts have nothing to do. It is too plain for argument, that the right to sell four gallons is as sacred as the right to sell any other quantity, however large, and can be rightfully no more abridged or taken away. And the owner is no more deprived of his property in one case than in the other, except in measure and degree. If, therefore, it be conceded that former statutes on this subject were valid enactments, it is folly to contend that this act is unconstitu-

tional, and to insist upon absolute individual right to the transmission of property from one to another as paramount to the authority of government.

A distinction has been attempted to be drawn between the power to restrict, by way of regulation, and the power to prohibit. But this distinction, if there be one, is altogether too narrow and uncertain to serve as the test of the rightful exercise of a power like that of making laws for the government of a state. The right to restrict and regulate includes that of prohibition. In reference to this right of government to regulate, the entire commerce of the state, in all its varied and almost endless branches and details, is to be regarded as one entire subject, or whole. Viewed in this larger and more comprehensive light, regulation, in its strictest sense, means nothing less than prohibiting some portions or branches, and permitting others to be carried on as before; abridging or taking away some rights and privileges before enjoyed, and conferring or continuing others, as the public good may require. The argument would seem to have some more force, if the traffic in this species of property constituted the entire commerce of the state and it could be shown that it had been entirely annihilated.

This whole controversy, so far as it involves any question of principle, is narrowed down to a struggle for the right of the individual to traffic, in whatever the law adjudges to be property, at his discretion, irrespective of consequences, over the right of government to control and restrict it within limits compatible with the public welfare and security. Everything beyond this is merged in considerations of expediency. This right of the owner to traffic in his property never was, since the institution of society, a right independent of the control of government. It is a right surrendered necessarily to the government, by every one when he enters into society and becomes one of its members. A government which does not possess the power

to make all needful regulations in respect to its internal trade and commerce, to impose such restrictions upon it as may be deemed necessary for the good of all, and even to prohibit and suppress entirely any particular traffic which is found to be injurious and demoralizing in its tendencies and consequences, is no government. It must lack that essential element of sovereignty, indispensably necessary to render it capable of accomplishing the primary object for which governments are instituted, that of affording security, protection and redress to all interests and all classes and conditions of persons within their limits. If, therefore, the act in question was, as is claimed, a naked prohibitory act, suppressing the traffic in this species of property altogether, which it clearly is not, the presumption would be that it was deemed by the legislature necessary for the public welfare, and I know of no power which could abrogate it except that by which it was enacted. If its validity could be made to depend in any degree upon the fact that the traffic is productive of the evils attributed to it—intemperance, pauperism and crime, a fact which is scarcely denied or questioned by any one—that fact has been established by the legislature. The conclusion of the legislature upon this question of fact is final and conclusive upon all courts and all persons, as long as the statute remains unrepealed. And the proposition that the government does not possess the power to protect itself and its citizens, to whom it owes protection as a primary and paramount duty, against the consequences of such a traffic, by prohibiting the traffic itself, is monstrous, and strikes at the very foundation of all government. The general maxim is, that the will of the legislature is the supreme law of the land, and demands perfect obedience. Although this rule does not fully obtain here, or in any government with a written constitution placing restrictions upon legislative power, yet " if there be no constitutional objection to a statute, it is with us as absolute and uncon-

trollable as laws flowing from the sovereign power under any other form of government." (1 *Kent's Com.*, 441.)

It is claimed that courts, independent of constitutional limitations upon legislative power, have the right to annul statutes and pronounce them void, whenever, in their judgment, they are in conflict with the fundamental principles of the government and tend to individual oppression, although not in conflict with any provision of the constitution of the United States or of the state. I know of no such power vested in the courts, and they should never attempt to usurp it. The limitations upon legislative power are written in the fundamental law, and that is the standard by which all questions of power exercised by the legislature must be tried. To this extent the question is a legitimate one for adjudication by the courts, as the construction of the fundamental law necessarily falls within their province. Nor does this involve the philosophical absurdity insisted upon by some writers, of the inferior power annulling the acts of the superior; because, upon our theory of government, the legislature is powerless when it attempts to pass the limits prescribed by the constitution. To this extent, under a written constitution, this power may be safely and properly exercised by the courts, and, indeed, its exercise often becomes necessary to prevent the encroachments of power, and to protect rights shielded by the constitution.

But, beyond this, such a power, exercised by the courts, would be a mere veto or dispensing power. No such power is conferred by the constitution, nor does it pertain to the judicial functions. Lord Campbell, in a recent case (*Woodward* v. *Watts*, 2 *E. & B.*, 457, 75 *C. L. R.*), emphatically disclaims any such jurisdiction on the part of the English courts as that habitually exercised by our courts in this respect. Indeed, without a written constitution, it has no foundation to stand upon.

Wynehamer *against* The People.

Should the time ever come when the courts, instead of promptly sustaining and enforcing the legislative will, become forward to thwart and defeat it, and assume to prescribe limits to its exercise other than those prescribed in the constitution; to substitute their discretion and notions of expediency for constitutional restraints; and to declare enactments void for want of conformity to such standards; or when, to defeat unpalatable acts, they shall habitually resort to subtleties and refinements and strained constructions to bring them into conflict with the constitution, the end of all just and salutary authority, judicial as well as legislative, will not be remote. When men, chafing under the restraints of particular statutes, and prompted by interest, passion, appetite or partizanship to disregard them and set their authority at defiance, once begin to expect from courts immunity and protection, instead of punishment, the judiciary will have lost, not only its claim to respect and confidence, but the power of enforcing general laws. Courts can only sustain their own authority and efficiency by vigilantly and fearlessly upholding and sustaining legislative enactments, in all cases where they are not plainly and clearly in derogation of constitutional limitations. The people have a far more certain and reliable security and protection against mere impolitic, over-stringent or uncalled-for legislation than courts can ever afford, in their reserved power of changing, annually and biennially, the representatives of their legislative sovereignty; and to that final and ultimate tribunal should all such errors and mistakes in legislation be referred for correction.

As there is nothing, therefore, in the constitution, either of this state or of the United States, which takes away or limits the rights of the legislature to make such regulations in regard to the traffic in property amongst the citizens of the state, and to impose such restrictions and prohibitions upon it as it shall deem necessary for the public good, this act, so far as it restricts and prohibits the sale of intoxica-

ting drinks, must be pronounced a valid, constitutional act, and entitled to obedience from every citizen of the state.

Several other questions were discussed upon the argu‑ ment, but as they have no bearing upon that portion of the act which applies to this case, it is unnecessary to notice them here.

I am accordingly of the opinion that the conviction should be affirmed.

MITCHELL, J. (Dissenting.) Wynehamer was indicted, tried by a common law jury and found guilty; no such objection as exists in Toynbee's case can be raised in this

The only questions properly arising in this case are: 1st. Whether the only remedy allowable under the pro‑ hibitory law is by complaint before the special sessions? 2d. Whether the 1st section of the act allows every one to sell imported liquors by retail, and in packages less than those in which they were imported? or, allows the sale of imported liquors only by such persons and in such quantities as the United States law, controlling the state, compels the state to allow? and whether that is a sale by the importer, and in the original packages? 3d. Whether the prohibition to sell intoxicating liquors owned by a man before and when that law took effect, except to persons authorized by that act to buy, or for medicinal, chemical, manufacturing or sacramental uses, is such a violation of the right of property as to be unconstitutional, although the legislature passed the law with a view to prevent intemperance, pau‑ perism and crime?

As to the 1st. The general sessions is the tribunal authorized to try all misdemeanors and crimes not punish‑ able with death or imprisonment in the state prison for life. (2 *R. S.*, 208, § 5.) This applies to all crimes (except the especially excepted cases), whether made so before the Revised Statutes or after, and whether the power was specially given to that court or not. This act declares the

offence of selling contrary to it to be a misdemeanor, and does not restrict the remedy under it to the special sessions. The close of the 20th section saves this jurisdiction; it is: " The existing provisions of law, relative to misdemeanors and offences, shall apply to offences created by this act, except where the same are inconsistent therewith." Section 23 declares it is the duty of grand juries to inquire into all offences against this act; that makes the offence indictable. As to the 2d. I adopt the reasoning of Judge Strong, in 20 *Barb.*, 207, 208, 209, and his conclusion, that the only effect of the saving clause in the 1st section is to allow the importer to sell in the original packages in which he imported; that is the only liquor, the right to sell which is given by any law or treaty of the United States. ( *See also id.*, 234, 235, 236.) It never could have been the design of the act to allow all imported liquors to be sold by all persons and in all quantities, while it prohibited the sale of domestic liquors by the most stringent law. The intention of a criminal law is to govern, and is to be discovered by reading the whole law; although it is not to be extended by a supposed equity to cases not within its terms. As to the 3d. I adopt the reasoning and conclusion of Justice Rockwell, in 20 *Barb.*, 232, 233, 234, 235, 236 ( *and see the opinion of Justice McLean, 5 How. U. S. R.*, 589, 590). The legislature has the undisputed right to forbid the sale of liquors except in large quantities (which it may prescribe), or by certain persons who are to be licensed, or in certain places, and to forbid it to be drank in certain places. Such laws impair very much the value and enjoyment of such property to such persons as would wish to use it in a different way. They are valid, not because they impair the value and enjoyment of the property only in a slight degree, which the opponents of this law call a regulation, but because they are not passed with a view to impair the right of property in any degree, but in the exercise of the plain duty of the legislature to prevent pauperism and

crime. In the exercise of this last power, the value of certain property is incidentally diminished to some persons but that result cannot take away the right or the duty of the legislature to exercise its power to prevent crime in the way that may be most effectual; they have deemed it necessary, in order to prevent crime, to prohibit any use of certain liquors except for certain purposes. This they may do.

If, as is argued, the legislature could not prohibit the keeping or sale of liquors, on hand when the law was passed, and may prohibit the sale of such as might be thereafter acquired, it would be the duty of the courts in this, as in other cases, to discriminate between the two cases, and to pronounce only such parts of the law void as were unconstitutional. Such has been, it is believed, the uniform practice heretofore. No difficulty could occur; it would be the business of the district attorney to draw the indictment so as to bring the case within the valid parts of the law; otherwise it would be demurrable. A contrary rule would, it is believed, be equally novel and dangerous. If the innocent and the guilty acts are blended together in the law, the court can easily separate them. I am of opinion that the judgment in this case should be affirmed.

T. A. JOHNSON, J. (Dissenting.) It has been shown, I think, in the case of *Wynehamer* v. *The People*, and we all agree, that imported liquors, the moment they leave the hands of the importer, have passed the line of foreign commerce and federal authority, and become exclusively subject to state regulations and control; and that when they are once brought into this condition, the only right which attaches, so far as any right flows from government, is derived wholly from state laws, and they are not then within the exception in the 1st section of the act. I have also attempted in that case, as I think successfully, to demonstrate that the legislature, being the sole and exclu

sive law-making power in the state, has by virtue of its office, from the very nature and constitution of government, the power, and is charged with the duty of regulating, restricting, controlling and even prohibiting altogether any traffic in any property which is found to be demoralizing in its effects upon the community, or injurious to its interests, or burthensome to the government; and that there is not, either in the constitution of the United States or in that of this state, any limitation or restriction upon the exercise of this power which is in any respect in conflict with the provisions of this act, so far as it prohibits the sale of intoxicating liquors.

The right of traffic or the transmission of property, as an absolute inalienable right, is one which never has existed since governments were instituted, and never can exist under government. The government has always regulated and controlled it to the full extent required, in its judgment, by the public interests and necessities, as the whole history of legislation will clearly show. Government possesses many powers which it does not habitually or frequently exercise, and only puts forth to remedy particular evils or to meet occasional exigencies. But it must necessarily have the same right to prohibit any particular traffic or branch of traffic which it finds or deems injurious, and to declare it criminal, that it has to prohibit and declare criminal the injurious conduct and practices of men in other respects. Otherwise, the right to property and its transmission would be held superior to the right to life and liberty. Our statutes " concerning the acquisition, the enjoyment and transmission of property, real and personal" (1 *R. S.*, 717), " of the regulation of trade in certain cases" (*id.*, 528), " of the proof and recording of conveyances of real estate" (*id.*, 755), all acts relating to revenue, excise, usury, champerty, lotteries and the like, with which our statute books abound, have their sole foundation in this right.

This being so, it follows inevitably that the occasion and necessity for the exercise of the power embodied in a statute is wholly a matter of legislative judgment and discretion, where no constitutional restriction intervenes, with which no other power in the government has any right to interfere, at least after the executive sanction has been given. If the legislature shall determine that the occasion has arisen or that the necessity exists for the exercise of a more extended and stringent power than it has hitherto exercised, who shall decide to the contrary? What other tribunal is clothed with power to entertain an appeal and reverse such determination? The veto power given to the executive is the only authority the constitution has provided, and that must be exercised before legislation has ripened into statutes, and is then not necessarily conclusive. Whoever bestows the slightest reflection upon the nature and character of the judicial office, will see that courts can entertain no such question; and any attempt on their part to take cognizance of it, and to draw it within their jurisdiction, would be a clear invasion of the legislative province and a usurpation of legislative power.

The spectacle of a conflict between the representatives of the legislative and the judicial sovereignty of the people respecting a question of this character, upon any other than clear, undoubted, constitutional grounds, would, at this day, be at once novel and alarming. Every legislative act, when questioned, is to be brought to the test of the constitution, and if the power exercised is not there forbidden in express terms, or by clear and necessary implication, courts have no discretion, but are bound to pronounce it valid. The right of courts to declare legislative enactments, in derogation of the constitution, void, is one which has been too long and steadily exercised in this country to be now doubted or questioned. It is, however, one of the highest and most delicate of all conservative powers, and is never to be exercised against the acts of the superior branch

of the sovereignty in doubtful and questionable cases. The legislative department being naturally the superior, its authority is always presumed to have been rightfully exercised. And this presumption is to prevail until the contrary has been made clearly to appear, and has been determined by the courts.

The only questions which arise in this case, differing from those considered in the case before referred to, relate to the authority and jurisdiction of the court of special sessions, before whom the defendant was tried and convicted, and the right of seizure and destruction of the contraband property.

These I propose very briefly to consider. It appears, from the case, that when the defendant was arrested and brought before the justice he objected to being tried by a court of special sessions, and offered to give bail to appear at the next court having criminal jurisdiction. The objection was overruled, the right to give bail denied, and the defendant was compelled to go to trial before the special sessions. It is claimed that the court erred in refusing to take bail. The court was, I think, right in refusing to take bail. The act undoubtedly contemplates and was designed to effect a speedy trial, and hence the justices and other officers authorized to issue a process under the act are required imperatively to hold courts of special sesssions to hear and determine charges, and to proceed to trial as soon as the complainant can be notified, unless for good cause shown an adjournment shall be granted. Hence, also, the privilege given to persons brought before a magistrate, in the cases prescribed in the Revised Statutes, of giving bail to appear at another court, and thus avoiding a trial before the special sessions, is not given to the persons complained of for the offences created by this act. Under the Revised Statutes the right of the court of special sessions to try a person for any of the offences therein specified is given, subject to the request of such person to be so

tried, or to his failure or refusal to give bail for twenty-four hours after being required by the magistrate. But the right of such court, under this act, is subject to no such conditions. On this point, as well as the others in the case, I agree fully with Wells, Justice, in the *People* v. *Fisher* (20 *Barb.*, 652).

It is contended that if this is the true construction of the act, it is, in this respect, in violation of the constitutional provision that "the trial by jury, in all cases in which it has been heretofore used, shall remain inviolate forever" It is conceded that the jury here referred to is a common law jury of twelve men. This act only allows a jury of six before a court of special sessions, and this clearly is not the jury intended by the constitution. The terms, "as heretofore used," in the constitution, mean as used before the adoption of the existing constitution. (*Cruger* v. *The Hudson River Railroad Co.*, 2 *Kern.*, 198, *per Johnson J.*; *Duffy* v. *The People*, 6 *Hill*, 78.)

Trials for offences of this grade have been uniformly authorized and had, long before the adoption of the present constitution, and indeed under all our previous constitutions, without the use of a jury, or with a jury of only six. It was expressly held by the court for the correction of errors, in the case last cited, that a statute which authorized a magistrate to convict a person of being a disorderly person, which included the power of sentence and commitment to jail, was constitutional, although it did not give the right of trial by jury. And in that case the power of the legislature to confer upon courts of special sessions the right to try offences, below the grade of felony, without indictment and without a jury, is fully recognized and sanctioned. It is argued that the right to have a trial by a common law jury was secured to every one charged with a misdemeanor under the provisions of the Revised Statutes, allowing them to give bail for appearance at a higher court. And hence the inference is sought to be drawn.

that the right has never been taken away in any case, but has always been used, and consequently, that the legislature had no right to take it away in these cases. It will be seen, however, that although by the Revised Statutes the jurisdiction of the special sessions to try and punish is made subject to certain conditions, the right of trial by jury is by no means there secured in all cases. If a person is unable to furnish bail to appear at another court, it is the right and duty of that court to try him, notwithstanding his desire or demand to be tried elsewhere. This is as much a violation of his right, if it is one secured by the constitution, as though the statute had in terms forbidden the magistrate to take bail.

But it is a question of power in the legislature to confer the jurisdiction upon these courts, and that question can never be made to depend upon the consent or request of the person accused, to be tried, or upon his ability to furnish bail to appear at another court. It is a privilege given by the legislature in such cases, which might have been withheld. The power of the legislature to determine before what courts, with or without a jury, offences of this character shall be tried, is, I think, undoubted. This view answers the other objection, that a trial and conviction before such a court is not by due process of law.

The case shows that the offence was committed in the presence of a policeman, who thereupon seized the bottle of champagne so sold, and the bottle of brandy and its contents from which the quantity sold to be drank had been taken. The right, therefore, to search for liquors, supposed or suspected to be kept for unlawful purposes, does not arise in the case. The court before which the defendant was tried adjudged that the liquor was unlawfully kept, and that it was forfeited, and issued a warrant for its destruction.

It is contended that no person can be deprived of his property in this manner. If the trial and conviction are

3 KERN.—31

by due course of law, it is difficult to see upon what foundation this objection can rest. The power of the legislature to authorize or impose, by way of penalty, the forfeiture, upon judicial sentence, of property kept or sought to be used contrary to law, cannot at this day be seriously questioned. It is the lowest grade and form of punishment for offences against the law, and has been too long and steadily exercised, without question, to be now involved in any doubt. Instances of the exercise of this power must be too familiar to every lawyer to need citation.

The act of seizure by the officer was clearly lawful. The unlawful act was open and flagrant in the officer's presence, and it would have been a gross and inexcusable breach of duty on his part had he overlooked it. The 12th section authorizes the seizure by an officer, under such circumstances, without warrant, to be taken before a magistrate, as was done in this case.

The conviction and sentence were, therefore, in my judgment, in all respects lawful and proper, and the judgment of the supreme court should be reversed.

WRIGHT, J., also delivered a written opinion in favor of affirming the judgment in the case of Wynehamer. He concurred in the dissenting opinions delivered by T. A. JOHNSON, J.

On deciding these cases, the court passed upon and affirmed the following propositions:

1. That the prohibitory act, in its operation upon property in intoxicating liquors existing in the hands of any person within this state when the act took effect, is a violation of the provision in the constitution of this state which declares that no person shall be " deprived of life, liberty or property, without due process of law." That the various provisions, prohibitions and penalties contained in the

act do substantially destroy the property in such liquors, in violation of the terms and spirit of the constitutional provision.

2. That inasmuch as the act does not discriminate between such liquors existing when it took effect as a law, and such as might thereafter be acquired by importation or manufacture, and does not countenance or warrant any defence based upon the distinction referred to, it cannot be sustained in respect to any such liquor, whether existing at the time the act took effect or acquired subsequently; although all the judges were of opinion that it would be competent for the legislature to pass such an act as the one under consideration (except as to some of the forms of proceeding to enforce it), provided such act should be plainly and distinctly prospective as to the property on which it should operate.

3. That the criminal proceeding in a court of special sessions authorized by the said act is unconstitutional and void because the accused is thereby deprived of the right of trial by jury, guaranteed by the constitution.

DENIO, C. J., A. S. JOHNSON, COMSTOCK, SELDEN and HUBBARD, JJ., concurred in the foregoing propositions.

MITCHELL, J., dissented from the first and second, and concurred in the third.

T. A. JOHNSON and WRIGHT, JJ., dissented from all of them.

All the judges, except T. A. JOHNSON, WRIGHT and MITCHELL, were in favor of reversing the judgment of the supreme court, and of the court of general sessions in the case of Wynehamer.

All the judges, except T. A. JOHNSON and WRIGHT, were in favor of affirming the judgment of the supreme court, which reversed that of the court of special sessions in the case of Toynbee.

Judgment accordingly.